PINELAKE HOUSING COOPERATIVE v CITY OF ANN ARBOR

Docket No. 85376. Submitted August 11, 1986, at Lansing. Decided March 23, 1987.

Pinelake Housing Cooperative and Forest Hills Housing Cooperative, federally-regulated low-income housing cooperatives having federal interest-reduction subsidies, each disputed the property tax assessments imposed by the City of Ann Arbor for several different years. Following separate hearings on their respective petitions before a Tax Tribunal hearing officer, the cases were consolidated. Petitioners' appraiser presented two different methods of valuation. The first method, called the "cooperative approach," fixed the value as equal to the value of the outstanding mortgage plus the total value of the membership fees in the cooperatives. This method resulted in valuations for Pinelake of from $914,732 to $1,023,203 and for Forest Hills of from $1,920,000 to $2,550,000. Petitioners' appraiser also used a capitalization of income approach, using actual income and expense experience of each property and capitalization rates of from 14.65 percent to 17.56 percent, which resulted in valuations for Pinelake of from $880,000 to $1,260,000 and for Forest Hills of from $1,275,000 to $2,770,000. Petitioners' appraiser testified that the cooperative approach more accurately represented the true cash values of the subject properties. Respondent's appraiser presented valuations based upon a cost approach and three variations of the income approach. Using the cost approach, Pinelake was determined to have a value of $3,029,000 and Forest Hills a value of $8,630,000. In each of the income methods, the actual income and expenses were not used but rather "normalized" figures that supposedly reflected the "normal" year-to-year income and expenses. The first income method included the federal interest-reduction subsidy as income and used capitalization rates of from 14.95 percent to 16.08 percent and yielded valuations of from $2,068,000 to $2,264,000 for Pinelake and from $4,172,000 to $5,051,000 for Forest Hills. The second variation used the

REFERENCES

Am Jur 2d, State and Local Taxation §§ 761, 762.

Requirement of full-value property taxation assessments. 42 ALR4th 676.

same net income figures as the first variant, which included the interest-reduction subsidy, but used capitalization rates of 10.7 percent for Pinelake and 10.99 percent for Forest Hills. Using these capitalization rates yielded valuations of from $3,050,000 to $3,160,000 for Pinelake and from $6,488,200 to $6,871,000 for Forest Hills. The third variant of the income approach used by respondent's appraiser did not treat the interest subsidy as income but used much lower capitalization rates of from 6.024 percent to 6.187 percent which yielded valuations for Pinelake of from $3,030,000 to $3,196,000 and for Forest Hills of from $5,987,900 to $7,433,400. The hearing officer rejected the appraisals suggested by petitioners' appraiser and accepted the appraisal of respondent's appraiser as calculated under the third variant of the income approach. The Tax Tribunal basically adopted the proposed judgment of the hearing officer. Petitioners appealed.

The Court of Appeals *held:*

1. The Tax Tribunal did not err as a matter of law by adopting a method of appraisal which analogizes the subject properties to income-producing properties and then employing an income approach. It was, however, error for the Tax Tribunal to accept respondent's income-approach appraisal which did not use the actual incomes and actual expenses but rather used normalized incomes or expenses.

2. The rate of capitalization of approximately six percent as used by the valuation accepted by the Tax Tribunal is absurdly low given the facts presented and, despite the assertions to the contrary, reflect a capitalization rate that is improperly based on the existence of the subsidy.

3. It cannot be said that the Tax Tribunal erred as a matter of law in not accepting the petitioners' appraisals.

4. The resolution of the problems created by attempting to place valuations for tax purposes on properties which are subject to federal regulations and subsidies is best left to the Legislature.

Reversed and remanded.

SHEPHERD, J., agreed that the matter must be remanded to the Tax Tribunal, but he would have the Tax Tribunal make a determination of whether the interest subsidies within the total context of the facts of the cases have any impact on the market values of the properties.

TAXATION — AD VALOREM TAXES — TAX TRIBUNAL — CAPITALIZATION OF INCOME — GOVERNMENT SUBSIDIES.

It is not an error of law for the Tax Tribunal to adopt for the

purpose of valuation of real property having a federal interest subsidy a method of appraisal which analogizes the subject property to income-producing properties and then employs a capitalization of income approach; in using the capitalization of income approach in the valuation of a property with a federal interest subsidy, the actual income and actual expenses, rather than any hypothetical or normalized values, shall be used; the federal interest subsidy may not be used to adjust the income or expenses nor shall it be incorporated into the rate of capitalization used to compute the real market value of the property.

*Michaelene K. Young,* for petitioners.

*John K. Van Loon,* for respondent.

Before: DANHOF, C.J., and SHEPHERD and D. L. HOBSON,* JJ.

PER CURIAM. This appeal involves consideration of the method adopted by the Tax Tribunal to assess the value of two low-income, government-subsidized housing projects for property tax purposes.

Petitioners, Pinelake Housing Cooperative and Forest Hills Housing Cooperative, are both located in the City of Ann Arbor, which is the respondent in this matter. Pinelake contests its tax assessments for 1981, 1982, and 1983. Forest Hills disputes its assessments for 1981, 1982, 1983, and 1984. Respondent contends that the true cash value of the projects is roughly three times the amount which the petitioners assert is the proper valuation for each of the tax years in question.

Pinelake and Forest Hills received separate hearings before a Tax Tribunal hearing officer. With the exceptions of the values derived, the hearings were virtually identical. The attorneys, the experts, and their propounded theories were

---

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

the same. By agreement of all of the parties, the hearing officer authored a single proposed judgment. From that point, the cases have been consolidated.

I

Pinelake is a federally-regulated low-income housing cooperative, consisting of 129 units. When built in 1975, the original mortgage balance was $2,871,900, payable at seven percent interest over forty years, and represented one hundred percent of the property's cost. The mortgage was guaranteed by the federal government through the Department of Housing and Urban Development pursuant to § 236 of the National Housing Act of 1959, as amended, 12 USC 1715z-1. The most significant aspect of HUD's participation in the project is an "interest-reduction" subsidy, which pays all except one percent of the interest due on the mortgage note.

The cooperative association contracted for the construction of the complex and owns the buildings and the land. Residents gained the right to possess units by purchasing membership certificates. To qualify as a member, an individual's income must be below limits set by HUD.

A membership certificate conveys some indicia of ownership to the occupants. The conveyed interest is analogous to owning a share in a corporation; a member does not own the specific unit in which he lives, but rather an intangible portion of the whole.

When a member leaves the co-op, he may transfer his interest to another person who meets the income requirement and other requirements of the co-op. However, members are not free to set their own price. Rather, the bylaws of the cooperative

establish the "transfer value." Originally, the transfer value was to have increased annually at a fixed rate after the fourth year of the project. However, sometime between 1979 and 1981, HUD granted Pinelake's request to freeze the transfer value at a range between $688 and $820, depending on apartment size.

Another indicium of ownership is that the members gain some measure of control in the management of the cooperative. They can vote for directors and can run for such offices. The board of directors makes management and administrative decisions within the limits of the regulatory agreement with HUD. However, control ultimately lies in the hands of HUD, which reviews the co-op's budget line by line and has power to reject any portion of it, to increase the percentage of income which a member must pay as monthly "carrying charges" (what the members pay instead of rent), to freeze the transfer value of a membership, and to require the co-op to make increased payments to reserves and so forth.

The carrying charges are applied to the co-op's operating expenses and the mortgage. The carrying charges are adjusted annually and are set at a level sufficient to cover the operating expenses and the co-op's obligation on the one percent mortgage. The charges are not designed to generate any "profit." If expenses increase or decrease, the carrying charges are adjusted in the following year's budget.

Despite the substantial federal subsidy, Pinelake is not without problems. As previously mentioned, the transfer value of its memberships was frozen sometime between 1979 and 1981 at the request of the cooperative at a range of between $688 and $820. The freeze was necessitated by the fact that Pinelake was having trouble finding low-income

individuals to fill vacancies who had sufficient cash on hand to pay both the membership fee (transfer value) and the first month's carrying charge. Together these amounts were over $1,000 in all cases. In 1980, Pinelake lost between two percent and three percent of its potential income due to vacancies. In 1981, vacancy loss rose to 9.5 percent. In 1982, vacancy loss represented 11.8 percent. Pinelake also experienced collection problems during those years. However, collection losses were smaller than vacancy losses.

Verna Spath, the co-op's president, testified that "very, very frequently" the residents do not give the required sixty-days notice of their intention to leave but instead simply stop paying the monthly carrying charge. By the time the residents move, the past due carrying charges plus the amount charged for damage to the unit "almost always" exceeds the transfer value of the membership.

Brady Caputo, the co-op's manager, testified that it costs an average of $1,500 to rehabilitate a unit after a member moves out. He also testified that, since the project was nine years old, it was beginning to require large maintenance expenditures. The tile floor and carpeting in the units needed to be replaced. The porches and sidewalks were in need of repair. The exterior needed repainting. Refrigerators were beginning to wear out.

Laurence Allen, petitioners' appraiser, testified that Pinelake was "generally in poor condition."

Steven Breshgold, the co-op's accountant, testified that the co-op was one month behind in paying bills.

II

Forest Hills is a similar but larger (306 units) cooperative housing project, subject to the same

regulations. It was developed in five phases. The first occupants moved in in 1971. The original amount of the five mortgages totaled $6,477,800.

The makeup of Forest Hills' member population is somewhat different than that of Pinelake's. While eighty percent of the units at Pinelake were occupied by single-parent families, Forest Hills has a "high rate of couple occupants." Laurence Allen, petitioners' appraiser, testified that he considered Forest Hills to be superior to Pinelake in both location and "property."

Unlike Pinelake, at the time of the hearing, Forest Hills had not frozen the transfer value of its membership. However, Forest Hills permits new members to initially pay only fifty percent of the membership fee, with the balance being paid off in installments. Even so, Forest Hills found that the high initial cash payment was burdensome and was in the process of seeking approval from HUD to freeze the transfer value. Forest Hills' vacancy losses for both 1980 and 1981 were less than one percent. Vacancy losses were 5.9 percent for 1982 and 4.5 percent for 1983.

Terry Lewis, Forest Hills' president, testified that the co-op repurchases the membership when a resident leaves. She testified that repurchases were necessary because the co-op had a one-third annual turnover rate. She did not believe memberships would be marketable if new members were not guaranteed a buyer at resale.

Like Pinelake, Forest Hills is undergoing a period where extensive repairs are becoming necessary due to the increased age of the project. There was no testimony that Forest Hills was behind in paying its creditors. However, there was testimony that, because of the increased vacancy loss problem, the co-op did have to hold off on a preventa-

tive maintenance program and the replacement of appliances.

### III

At the hearings before the Tax Tribunal hearing officer, both petitioners' appraiser and respondent's appraiser testified that valuation of the subject properties was made more difficult because, except for foreclosures, they were unaware of any such property which had ever been sold.

Laurence Allen, petitioners' appraiser, presented two approaches. In the first, which he called the "cooperative approach," Allen theorized that the value of a § 236 cooperative is equal to the value of the outstanding mortgage plus the total value of the membership fees.[1] Adding these two amounts together, Allen concluded that the properties' true cash values for the years in dispute were:

| YEAR | PINELAKE | FOREST HILLS |
|------|----------|--------------|
| 1981 | $ 914,732 | $2,140,000 |
| 1982 | 780,539 | 1,920,000 |
| 1983 | 1,023,203 | 2,440,000 |
| 1984 | | 2,550,000 |

The second approach Allen employed was the

[1] To determine the total value of the membership fees, Allen simply added together the transfer value of each unit. For Pinelake the aggregate value of the membership fees was $97,692 for each year in dispute. For Forest Hills, values were $292,940, $325,090, $373,770, and $442,450 for tax years 1981 through 1984 respectively.

To determine the value of the mortgage of each property, Allen assumed a twenty-year holding period and discounted the principal balance on each tax day to present value, using as a discount rate the yield rates for HUD mortgages as of December of each year. The discount rates that were used were 13.08 percent, 15.45 percent, 11.80 percent, and 11.51 percent for the tax years 1981 through 1984 respectively. Under this technique, Allen determined that the value of Pinelake's outstanding mortgage balance for the 1981 to 1983 tax years was $914,732, $780,539, and $1,023,203. For Forest Hills, the value of the outstanding mortgage balance for 1981 to 1984 was determined to be $1,817,921, $1,565,282, $2,036,826, and $2,099,874.

"*Congresshills*"[2] approach. Using the actual in-
come and actual expense experience of the proj-
ects, Allen calculated net income[3] for each prop-
erty, which he multiplied by overall capitalization
rates of 13.38 percent, 14.46 percent, 11.66 per-
cent, and 11.66 percent for 1981 to 1984 respec-
tively. To the overall capitalization rate, Allen
added a tax capitalization rate to arrive at total
capitalization rates of 16.63 percent, 17.56 percent,
14.65 percent, and 14.81 percent, for 1981 to 1984,
respectively. Allen testified that the *Congresshills*
approach indicated the following values:

| YEAR | PINELAKE | FOREST HILLS |
|------|----------|--------------|
| 1981 | $1,070,000 | $1,275,000 |
| 1982 | 880,000 | 2,065,000 |
| 1983 | 1,260,000 | 2,545,000 |
| 1984 | | 2,770,000 |

Allen's final conclusion was that the cooperative
approach more accurately represented the true
cash values of the subject properties than did the
*Congresshills* approach.

Respondent's appraiser, David Geragosian, pre-
sented a cost approach and three variations of the
income approach. In the cost approach, Geragosian
used the Marshall Valuation Service Manual and
determined that the value for Pinelake under a
cost approach was $3,029,200 and the value for
Forest Hills was $8,630,600. In Geragosian's opin-

___

[2] The *Congresshills'* approach is the product of this Court's decisions
in *Congresshills Apartments v Ypsilanti Twp,* 102 Mich App 668; 302
NW2d 274 (1981), and *Congresshills Apartments v Ypsilanti Twp
(After Remand),* 128 Mich App 279; 341 NW2d 121 (1983).

[3] The net income was determined without a deduction for property
tax expense, which is typically considered to be an operating expense.
The property tax expense is not included in the computation because
that amount is the subject of the instant dispute, and obviously
cannot be determined until this litigation is finally resolved. To offset
the artificially high income amount, a tax capitalization rate is added
to the overall capitalization rate.

ion, the regulatory agreement did not affect economic obsolescence and the value under the cost approach would be the same whether or not the regulatory agreement was in place.

Because of the lack of sales of comparable properties, Geragosian was unable to provide a traditional market approach.

Geragosian relied principally upon the income approach, of which he presented three variants. However, Geragosian did not use actual income and actual expenses in his computations, but rather used "normalized" figures.[4] The "normalized" income and expense figures were used in all three variants of the income approach.

In Geragosian's first variation (Variant I), Geragosian included the interest reduction subsidy as part of petitioners' income. For total capitalization rates, Geragosian used 15.30 percent, 16.08 percent, and 14.95 percent[5] for tax years 1981 to

---

[4] For Pinelake, Geragosian determined actual income for 1981 to 1983 was $540,776, $527,044, and $571,581, respectively. Because he "felt" the income for 1982 "did not fit in," Geragosian "normalized" that year's income by substituting for it the average of the incomes of that year, the preceding year, and the following year, a process which resulted in an adjusted income figure of $556,178 for 1982. Geragosian did not adjust the 1981 and 1983 figures downward to offset the upward adjustment of the 1982 figure.

Geragosian also "normalized" Pinelake's expenses for 1982 downward from $246,276 to $223,575.

In adjusting expenses for Forest Hills, Geragosian used a slightly different method. Rather than comparing the *total* yearly expenses, as he had done in his Pinelake appraisal, Geragosian compared Forest Hills' individual accounts. For example, in 1982 Forest Hills spent $56,931 for appliances. In 1980, the project had spent only $30,894. Because he felt the 1980 experience was "more normal," Geragosian substituted the lower 1980 figure for the 1982 figure. Geragosian also "normalized" other expense accounts with downward adjustments of approximately $70,000.

The effect of each adjustment was to increase Geragosian's final appraisals of true cash value.

[5] Geragosian derived the above capitalization rates from a table, the source of which he described only as "data from life insurance companies." It was Geragosian's opinion that these rates were based

1983.[6] Under this approach, Geragosian concluded that the true cash values for the years in question were:

| YEAR | PINELAKE | FOREST HILLS |
|------|----------|--------------|
| 1981 | $2,136,000 | $4,660,500 |
| 1982 | 2,068,000 | 4,172,400 |
| 1983 | 2,264,000 | 5,051,000 |

In Variant II, Geragosian used the same net income figures, i.e., he again included as income the interest-reduction subsidy. However, he employed a different total capitalization rate. For Pinelake he used 10.7 percent and for Forest Hills he used 10.99 percent. He applied the same rate to all years in dispute.[7] Using this approach, Geragosian gave only a range of values for the tax years 1981 to 1983:[8]

| PINELAKE | FOREST HILLS |
|----------|--------------|
| $3,050,000 to | $6,488,200 to |
| $3,160,000 | $6,871,000. |

Geragosian acknowledged that his Variant I and Variant II valued the federal subsidy. However, he asserted that Variant III did not value the subsidy. In that approach, Geragosian deducted the interest-reduction subsidy from the income amount. However, Geragosian used much lower total capitalization rates: 6.134 percent, 6.024 percent, 6.187

on "actual experience," i.e., "the consensus of 20 life insurance companies accounting for 68% of non-farm mortgages held by U.S. life insurance companies."

[6] Because of time restraints, Geragosian did not present Variant I in his appraisal of Forest Hills for the 1984 tax year.

[7] Geragosian did not explain how he arrived at these capitalization rates other than to write in his appraisals that they were "based on a 7 % mortgage interest rate (actual) with an average amortization period remaining" of thirty-four years for Pinelake and thirty years for Forest Hills.

[8] Again, because of time restraints, Geragosian did not present this approach in his appraisal of Forest Hills for the 1984 tax year.

percent, and 6.187 percent for tax years 1981 to 1984. Although it is unclear, it appears that Geragosian used a mortgage-equity formula to derive these capitalization rates because he wrote in his appraisals that the rate was based on a one percent mortgage, forty-year term, zero down payment, and one hundred percent financing. See *Northwood Apartments v Royal Oak,* 98 Mich App 721; 296 NW2d 639 (1980). Under this approach, Geragosian gave the following conclusions of value:

| YEAR | PINELAKE | FOREST HILLS |
| --- | --- | --- |
| 1981 | $3,030,000 | $6,562,200 |
| 1982 | 3,183,000 | 5,987,900 |
| 1983 | 3,196,000 | 7,196,800 |
| 1984 |  | 7,433,400 |

Geragosian testified that he did not use the *Congresshills* approach and that he didn't "know what the Court of Appeals is purporting to do in determining value with that approach."

Geragosian's final conclusion was that the cost method was a meaningful approach and a strong indicator of value, but that Variant III most accurately reflected true cash value.

The hearing officer rejected the appraisal submitted by the petitioners and adopted Geragosian's final conclusions of value. With one minor exception not relevant here, the Tax Tribunal adopted the proposed judgment of the hearing officer.

IV

Petitioners claim on appeal that the Tax Tribunal committed an error of law or adopted a wrong principle by accepting respondent's method of valuation. Petitioners also claim that the Tax Tribunal erred by rejecting their valuation approach.

v

The Michigan Tax Tribunal has exclusive and original jurisdiction to review final decisions relating to assessments under the property tax laws. MCL 205.731; MSA 7.650(31). A proceeding before the tribunal is independent and de novo. *Consolidated Aluminum Corp v Richmond Twp,* 88 Mich App 229, 232-233; 276 NW2d 566 (1979); MCL 205.737(1); MSA 7.650(37)(1). The tribunal may not simply accept a respondent's assessment, but must make its own findings of fact and arrive at a legally supportable conclusion of true cash value. *Consolidated Aluminum Corp, supra.*

This Court's standard of review of tribunal decisions is set forth in Const 1963, art 6, § 28:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decision, findings, rulings, and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record. Findings of fact in workmen's compensation proceedings shall be conclusive in the absence of fraud unless otherwise provided by law.
>
> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decisions relating to valuation or allocation.

The Legislature is charged with the duty of providing a uniform system of real property taxation based on assessment of true cash value. Const

1963, art 9, § 3. "Cash value" means "usual selling price," meaning the price which could be obtained at a private, not forced sale. MCL 211.27; MSA 7.27. "True cash value" and "fair market value" are synonymous. *CAF Investment Co v State Tax Comm,* 392 Mich 442, 450; 221 NW2d 588 (1974).

Generally, there are three accepted methods of valuation: the capitalization-of-income approach, the cost-less-depreciation approach, and the market approach. These approaches are briefly described in *Antisdale v Galesburg,* 420 Mich 265, 276-277, n 1; 362 NW2d 632 (1984). It is the duty of the Tax Tribunal to accept the approach which provides the most accurate valuation under the circumstances of each case. 420 Mich 277. Any method for determining true cash value which is recognized and reasonably related to the fair market value of the property is an acceptable indication of true cash value. *Presque Isle Harbor Water Co v Presque Isle Twp,.* 130 Mich App 182, 190; 344 NW2d 285 (1983).

Regardless of the valuation method employed, the value determination must represent the amount for which the subject property would sell. 130 Mich App 192-194; *Safran Printing Co v Detroit,* 88 Mich App 376; 276 NW2d 602 (1979), lv den 411 Mich 880 (1981). In other words, the valuation must be based on current *market* conditions. *CAF Investment Co, supra,* p 455. If the property is burdened by some restriction, such as a below-market long-term lease, *CAF Investment, supra,* or a deed restriction, *Lochmoor Club v Grosse Pointe Woods,* 3 Mich App 524; 143 NW2d 177 (1966), the impaired value of the property cannot be ignored and the property must be valued as restricted. More specifically, federal restrictions on rental income must be considered in determining the true cash value of the property.

*Congresshills Apartments v Ypsilanti Twp,* 102
Mich App 668; 302 NW2d 274 (1981) *(Congresshills
I).* Also, when considering subsidized housing, the
subsidy itself may not be considered as part of the
real property and the subsidy value may not be
included as part of the property value. *Congress-
hills Apartments v Ypsilanti Twp (After Remand),*
128 Mich App 279; 341 NW2d 121 (1983) *(Con-
gresshills II).*

Three reported appellate decisions which have
reviewed the valuation of § 236 properties, *Con-
gresshills I, supra, Congresshills II, supra,* and
*Antisdale, supra.*[9] All three cases deal with § 236
"limited dividend" projects[10] not § 236 coopera-
tives. Nevertheless, these cases are helpful in un-
derstanding the characteristics of federally subsi-
dized properties and the applicable valuation prin-
ciples. Also, the cases are relevant because the
appraisal which the Tax Tribunal accepted treated
the subject properties as rental properties, disre-
garding their cooperative form.

In *Antisdale, supra,* pp 283-284, the Supreme
Court explained that a cost approach to valuation
is generally an inappropriate method to value low-
income, government-subsidized housing projects:

   The Tax Tribunal seemed startled at the possi-
   bility that the subject property might be worth
   less than 70 percent of the principal balance of its
   mortgage. Together, petitioners and the federal
   government spent $1,718,325, to build the complex
   on the subject property. Using the cost of repro-
   duction less depreciation method, respondent's as-

---

[9] See also cases cited in footnote 13.

[10] Limited dividend property is investor-owned and bought and sold
primarily, if not solely, as tax shelters. However, investors in such
projects are restricted from withdrawing more than six percent of
their original investment per year from the project's revenues and
then only if the funds are available and approval is gained from HUD.
Hence the name, "limited dividend."

sessor valued the property at over $1,700,000. Nevertheless, if the market method to valuation is used, and the non-market mortgage is discounted, the property might reflect a value even less than half its cost immediately upon completion. Upon further analysis, however, such a result is not improbable.

Without the federally subsidized mortgage such properties would be nearly worthless. Evidence showed that such projects are typically constructed in areas where rents, if at market rates, would be beyond the financial capability of the local population to afford. Furthermore, evidence was introduced which showed that the quality of construction in such projects was greater than usually seen in non-federally subsidized projects, thus increasing their cost, but adding little value which would command greater rents if the market could bear them. As stated in *Meadowlanes Limited Dividend Housing Ass'n,* [unpublished opinion of the Tax Tribunal, decided January 6, 1984 (Docket No. 55933)]:

"Without the federal subsidy, neither [the owner] nor any other prudent investor could have been induced to invest in the project. The cost to build these units would require rental income far in excess of what could be obtained in the marketplace (and still generate sufficient profit so as to be economically viable). In fact, without the subsidy, debt service would be so high, there would be substantial negative cash flow which could reduce the tax shelter benefit to a point where the shelter was no longer an incentive to purchase."

Even the most desirable structure, if, for example, placed in an undesirable location, may be immediately worth much less than its cost to construct. Other factors can lead to the same result.

That is not to say that these subsidized properties, nearly guaranteed by federal rent ceilings to generate no income, have no value. The market approach, when properly used, demonstrates that there is a value to these properties, although

considerably less than their cost to construct. [420 Mich 283-284.]

In *Congresshills I,* this Court held that when the income approach is used to value § 236 limited-dividend property, the computation should not be based on hypothetical rental income and expenses or market averages, but rather upon actual income and actual expenses. In *Congresshills II, supra,* p 286, this Court reviewed the six percent capitalization rate which had been employed and held that it was absurdly low and erroneous as a matter of law, suggesting that a market capitalization rate should have been employed. By requiring that actual income and actual expenses be used, the *Congresshills* approach values the property's actual income experience rather than the property's potential capacity for earning income, the focus of more traditional income approaches.

The appraisers of both parties have testified that the *Congresshills* approach does not accurately reflect value. Respondent's appraiser did not really explain his objection, but simply stated that he did not understand what the approach was meant to value. Petitioners' appraiser's chief complaint was that the *Congresshills* approach fails to recognize the effect of the government regulation which prohibits § 236 cooperatives from generating cash flow, i.e., income above the amount necessary to meet the obligations of such property.

The monthly carrying charges which residents of the subject properties pay are adjusted once a year during a budgetary process in which estimates of the succeeding year's income and expenses are made. The carrying charges for the next year are then based on this estimate. No allowance for "profit" is figured into the charges. The fact that revenues are tied to expenses in this

manner and the fact that "profit" is not sought must be considered in conjunction with the concept of net income.

To determine net income under the income approach, operating expenses are subtracted from gross income. However, mortgage payments are not considered to be an operating expense, but rather an expense of financing the property. Because the annual budget process makes gross income a function of expenses so that the project generates no cash flow, the result is that when actual expenses are subtracted from actual income, all that is basically left are the annual payments on the mortgage.[11] The concern is that the capitalization of the total annual mortgage payment has no relationship to the property's value.

However, it is our opinion that such a result nevertheless represents the values that such properties possess. Such projects, when solvent, are able to generate sufficient income to retire the mortgage debt at the one percent effective rate. The ability of a property to generate sufficient income to pay off its underlying financing is value. The fact that "net income" under the *Congresshills* approach represents little more than the annual debt service is simply an expression of our belief that under the regulatory restrictions such projects have little other value.[12]

[11] Note that there are other necessary (but nonoperating) expenses besides the mortgage payment (mainly payments to reserves) that will be derived through application of the *Congresshills* approach. However, these expenses are relatively minor. While the appraisers for the parties disagreed below as to how payments and withdrawals from reserves should be treated, the issue has not been raised on appeal.

[12] The net income derived through use of the *Congresshills* approach will vary slightly from year to year from the exact amount of the yearly mortgage payments. However, the variation is due in large part to the inability to precisely forecast the following year's income

VI

We conclude that the Tax Tribunal did not err as a matter of law by adopting a method of appraisal which analogizes the subject properties to income-producing properties and by employing an income approach. There was substantial evidence that the membership fees were in essence nothing more than large security deposits. It was shown that memberships were not transferred to third parties by the members but were merely reclaimed by the cooperatives when residents left.

However, for the following reasons, we conclude that the Tax Tribunal committed several errors of law by accepting respondent's conclusions of true cash value;

(1) The valuation approach which the Tax Tribunal accepted did not use actual income and actual expenses as required by *Congresshills I.*

(2) The valuation approach which the Tax Tribunal accepted used a total capitalization rate of approximately six percent, which this Court held in *Congresshills II, supra,* p 286, was absurdly low and erroneous as a matter of law. Use of such a low capitalization rate is at least equally absurd given the facts of the instant case. Respondent's own appraiser wrote in both of his appraisals:

> In a federally subsidized, nonprofit cooperative there is no cash flow dividend (prohibited by the · agreement). There is no tax shelter to the nonprofit cooperative association, and a very uncertain and unknown possibility of a capital gain at the end of the regulated holding period (40 year mortgage).

Given the total lack of attractiveness of the prop-

and expenses during the budgeting process when the annual carrying charge schedules are established. Any error in forecasting would appear to be compensated for in the succeeding year's budget.

erties, it cannot be seriously argued that a hypo-
thetical investor would be willing to purchase
either property at a price which assumes such a
low capitalization rate, especially during tax years
when the prevailing rate of interest was extremely
high. A six percent capitalization rate is totally at
odds with the uncontroverted premise that the
subject properties lack the ability to transfer any
substantial benefit of ownership.

(3) Respondent's appraisals, upon which the Tax
Tribunal relied, are internally inconsistent on
their face and unreliable as a matter of law.
Geragosian testified that Variant I and Variant II
valued the subsidy while Variant III excluded the
subsidy's value. Yet Variant III generated values
substantially the same as Variant II and Variant I
produced values which were substantially lower
than Variant III. It is not logical that the interest-
reduction subsidy, which generated income equal
to thirty percent to thirty-eight percent of the
income which the projects generated from carrying
charges (depending upon the project and the year)
had either no value or a negative value.

(4) Contrary to Geragosian's testimony, Variant
III did value the subsidy. While Geragosian sub-
tracted the amount of the interest-reduction sub-
sidy from the income amount in Variant III, he
offset the subtraction by lowering the capitaliza-
tion rate. Geragosian justified selection of a lower
capitalization rate on the basis that this approach
relied upon an analysis which assumed a one
percent mortgage, which was the "actual mortgage
of the subject properties." However, the one per-
cent mortgage *is* the subsidy. To derive a capitali-
zation rate based on the assumption of a one
percent mortgage is to value the subsidy. The
interest subsidy is an intangible asset and is not a

proper subject to be taxed under Michigan's property tax laws. *Congresshills II, supra,* p 283.[13]

### VII

As to petitioners' argument that the Tax Tribunal erred as a matter of law in rejecting the appraisals of their expert, this Court's standard of review does not permit it to hold that the Tax Tribunal committed an error of law by not accepting petitioners' appraisals. Other methods which have not been presented here might better reflect true cash value.[14] It is the duty of the Tax Tribunal to make its own finding of true cash value. MCL 205.737(1); MSA 7.650(37)(1); *Consolidated Aluminum Corp, supra,* pp 232-233.

### VIII

Having considered the arguments of the parties, we note that our decision was not reached without concern. Philosophically, we adhere to the belief that everyone should pay their fair share. We realize that the possibility exists that this decision might result in the petitioners' paying less in property taxes than necessary to supply the services which they require. The fact that the federal government subsidizes such projects does not seem

---

[13] Recently, a panel of this Court released *Meadowlanes Limited Dividend Housing Ass'n v City of Holland,* 156 Mich App 238; 401 NW2d 620 (1986). This decision suggested that the interest subsidy should be considered as part of the value of a limited dividend project. This suggestion was recently criticized by another panel of this Court in *Tradewinds East Associates, LDHA v Hampton Charter Twp,* 159 Mich App 77, 88, n 1; — NW2d — (1987). As stated *infra,* n 15, in the instant case, the parties have assumed in their arguments that the interest subsidy should not be valued.

[14] For example, if the interest subsidy were subtracted from the income variable and if the income and expense figures had not been "normalized," respondent's Variant I would appear at this juncture to be an adequate representation of true cash value.

to be a sufficient reason to require the cities and townships in which such projects are located to bestow an additional subsidy in the form of reduced property taxes.

However, our conclusion is compelled because under our ad valorem system of taxation, a property owner's level of taxes is determined by the property's fair market value. The market value of § 236 properties is severely impaired because the federal government restricts the rents or carrying charges which may be charged, permits only low-income tenants to occupy the units, and builds such projects in areas which are not optimally attractive. The value of § 236 limited dividend projects is specifically impaired for the additional reason that the federal government limits the return which the owner of such projects may realize. In short, § 236 property is designed to keep revenues (rents and carrying charges) low, not to maximize profitability.[15] Thus, a serious question arises whether market principles of valuation are appropriate in situations where, as here, federally-regulated properties operate largely outside the forces of the marketplace. However, the solution is best left to the Legislature[16] and we abide by what we perceive to be the current state of the law.

[15] The "market value" for property tax purposes is further reduced by our decision in *Congresshills II, supra,* that the interest-reduction subsidy should not be considered as income to the project and should not form a part of the property's taxable value. Neither party has asked this Court to reconsider that holding, and neither has briefed the issue.

[16] MCL 125.1415a; MSA 16.114(15a), which permits federally regulated housing projects to pay ten percent of annual shelter rents as an annual service charge for public services in lieu of all taxes, is inadequate. A municipality, as respondent has here, may opt not to accept the service charge in lieu of property taxes. More importantly, the service charge may not exceed "the taxes that would be paid but for this act." Thus, there is still a need to obtain appraisals which purport to determine "market value." Moreover, there is evidence in the instant case which suggests that many times the "true cash value" of such property would be less than the ten percent service charge, rendering the statute without effect.

Reversed and remanded for further proceedings consistent with this opinion.

SHEPHERD, J. *(concurring).* I agree that this case must be remanded and I accept the rationale of the majority with one exception. The majority says:

> However, the one percent mortgage *is* the subsidy. To derive a capitalization rate based on the assumption of a one percent mortgage is to value the subsidy. The interest subsidy is an intangible asset and is not a proper subject to be taxed under Michigan's property tax laws.

In *Meadowlanes Limited Dividend Housing Ass'n v City of Holland,* 156 Mich App 238; 401 NW2d 620 (1986), we remanded to the Tax Tribunal and required that it take into account the value, *if any,* of the mortgage interest subsidy. In *Meadowlanes* we expressed no opinion as to the effect of that subsidy in the particular case since that decision is to be made initially by the Tax Tribunal.

Similarly, in this case I would have the Tax Tribunal make a determination of whether the interest subsidy within the total context of the facts of this case has any impact on market value.