FOREST HILLS COOPERATIVE v CITY OF ANN ARBOR

Docket Nos. 305194 and 306479. Submitted January 9, 2014, at Lansing.
    Decided June 12, 2014, at 9:00 a.m. Leave to appeal sought.

Forest Hills Cooperative filed a petition in the Tax Tribunal to
    challenge the city of Ann Arbor's assessments of eight parcels for
    tax year 2000. Seven parcels had residential buildings used for
    nonprofit cooperative housing units and one parcel was vacant
    land zoned for commercial purposes. Tax years 2001 through 2009
    were eventually added to Forest Hills' petition, and the case was
    heard by a hearing officer. The hearing officer entered a proposed
    opinion and judgment. He used a cost-less-depreciation approach
    to value the property and recommended a partial uncapping of the
    taxable value of each parcel when a unit was transferred. He also
    recommended affirming the assessed value of the vacant parcel
    because Forest Hills had not offered evidence that could be used to
    determine the value. Both Forest Hills and the city filed exceptions
    to the hearing officer's proposed opinion and judgment, which the
    tribunal adopted in its opinion and order. Forest Hills appealed in
    Docket No. 305194.

    While its Tax Tribunal petition was still pending, Forest Hills
    filed a complaint in the Washtenaw Circuit Court against the city
    and the Ann Arbor City Assessor, seeking a declaration that MCL
    211.27 was unconstitutional as applied to value its property or a
    declaration that MCL 211.27 required the use of Forest Hills'
    actual income or stock prices to determine the value of its property.
    Forest Hills also alleged that the statute violates due process and
    equal protection, claimed violations of 42 USC 1983, and sought
    injunctive relief. The city and the city assessor moved for summary
    disposition under MCR 2.116(C)(4) on the ground that the Tax
    Tribunal had exclusive jurisdiction to consider Forest Hills' chal-
    lenge to the valuation method used to determine its property
    taxes. Forest Hills argued that it had the right to establish that the
    statute was facially invalid on the basis of the facts pleaded in its
    complaint. The court, David S. Swartz, J., determined that it had
    jurisdiction to consider whether the statute was unconstitutional
    as applied and pleaded but did not have jurisdiction to consider the
    42 USC 1983 and injunctive claims. The court held the case in

abeyance pending the tribunal's final decision on Forest Hills' petition. Following that decision, Forest Hills moved for summary disposition, seeking a declaration that MCL 211.27(4) required the use of either the capitalization of its actual income or the values for the transfer of shares in order to value Forest Hills' property or, in the alternative, a declaration that MCL 211.27(4) was unconstitutional. The city and the city assessor also sought summary disposition, asserting that the court could accept the allegations in the complaint as true for purposes of the motion, but should hold that it lacked subject-matter jurisdiction to address Forest Hills' claim because it was nothing more than a challenge to a property tax assessment framed in constitutional terms. The court denied Forest Hills' motion for summary disposition and granted summary disposition in favor of the city and the city assessor. Forest Hills appealed in Docket No. 306479, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. Const 1963, art 9, § 3 requires use of the true cash value of property to determine property taxes. MCL 211.27(1) defines "true cash value" in part as the usual selling price at the location where the property is at the time of the assessment, being the price that could be obtained for the property at private sale and not at auction or forced sale. Although the Tax Tribunal should consider different approaches in determining true cash value, its duty is to determine an approach that most accurately reflects the property's value. The tribunal may reject both parties' theories of valuation in making this determination. It may not automatically accept a respondent's assessment in a property-tax proceeding, but it may adopt the assessed valuation on the tax rolls as its independent finding of true cash value when competent and substantive evidence supports doing so, as long as the tribunal does not afford the original assessment presumptive validity.

2. Forest Hills argued that the Tax Tribunal violated its statutory duty to make an independent determination of the true cash value of the property by instead simply rubber-stamping the true cash value on the tax rolls. The hearing officer decided that a cost-less-depreciation approach was the most accurate valuation method for the improved parcels. Under the cost-less-depreciation approach, true cash value is derived by adding the estimated land value to an estimate of the current cost of reproducing or replacing improvements and then deducting the loss in value from depreciation in structures, that is, physical deterioration and functional or economic obsolescence. Functional obsolescence refers to a loss of value brought about by failure or inability of the assessed property

to provide full utility. Economic obsolescence refers to a loss of value occasioned by outside forces. The measure of allowable obsolescence is a subjective determination that demands an exercise of judgment. Economic obsolescence should be calculated in light of the property's highest and best use. The hearing officer found it possible that functional or economic obsolescence should be estimated in applying this approach, but also determined that there was insufficient evidence to allow for an independent estimate of depreciation from those sources. By his express determination that he could not make an independent estimate of functional or economic obsolescence, the hearing officer partially violated the rule against according presumptive validity to an assessment. Moreover, the tribunal subsequently stated that economic obsolescence did not exist. Because the tribunal was therefore operating under a misconception about the hearing officer's findings and failed to address economic obsolescence itself, it committed an error of law. Accordingly, remanding the case to the Tax Tribunal was necessary for it to make an independent determination of the amount of functional and economic obsolescence, if any, to be used in determining the true cash value of the improved parcels under the cost-less-deprecation approach.

3. Considering the hearing officer's express determination that he could not make an independent determination of the true cash value of the vacant parcel, the Tax Tribunal committed an error of law by adopting the hearing officer's proposed opinion regarding this parcel and remand was also necessary for the tribunal to make an independent determination of the true cash value of the vacant parcel.

4. Forest Hills additionally argued that the Tax Tribunal made an error of law in applying MCL 211.27 by failing to use a capitalization-of-income approach to value. This approach is based on the premise that a property's value is related to how much income the property can earn. It measures the present value of the future values of the future benefits of property ownership by estimating the property's income stream and its resale value and then developing a capitalization rate that is used to convert the estimated future benefits into a present lump-sum value. Forest Hills argued that the Legislature intended to establish special rules for determining the true cash value of a nonprofit cooperative when it amended MCL 211.27 in the face of two Supreme Court decisions regarding the determination of true cash value for rental properties. MCL 211.27(1), however, does not require that assessments be based on a particular valuation method. Because the Legislature did not direct that specific methods be used, the

task of approving or disapproving specific valuation methods or approaches falls to the courts, and the material question in this case was whether the tribunal adopted a wrong principle by rejecting Forest Hills' proposed approach for the improved parcels. Forest Hills failed to establish that the tribunal applied any wrong principle in concluding that the cost-less-depreciation approach rather than the capitalization-of-income approach provided the most accurate determination of value. Forest Hills also failed to establish that the tribunal adopted a wrong principle by not using Forest Hills' proposed transfer-value approach, which was based on a formula related to the purchase of a membership in the cooperative. The consideration paid by Forest Hills to an occupant moving out of a unit did not measure the benefits of home ownership associated with the unit, and transfer value was therefore not equivalent to fair market value.

5. MCL 211.27a(2) and (3) place a cap on the taxable value of a property so that, on the basis of the previous year's taxable value, any yearly increase in taxable value is limited to either the rate of inflation or 5%, whichever is less. That cap on taxable value applies only to the current owner of the property, and the property's taxable value is uncapped when the property is transferred. The uncapped taxable value for the year after the transfer sets a new baseline value that is subject to a new cap. MCL 211.27a(6)(j) defines "transfer of ownership" as including the conveyance of an ownership interest in a cooperative housing corporation except for the portion of the property not subject to the ownership interest conveyed. Forest Hills argued that the Tax Tribunal violated MCL 211.27a(6)(j) by prorating the uncapped taxable value associated with the transfer of a unit in the housing cooperative to units that did not transfer, contending that the increase in taxable value had to be confined to the transferred unit and, therefore, that separate parcel numbers had to be assigned to each unit. Forest Hills, however, was the only owner of the parcels of real property at issue in this case. MCL 211.27a(6)(j) does not address transfers of ownership of parcels of real property, but only addresses transfers of an ownership interest in the cooperative housing corporation itself. The tribunal therefore did not err in its application of MCL 211.27a(6)(j)

6. The circuit court lacked jurisdiction to consider Forest Hills' request for declaratory relief. A challenge to the circuit court's subject-matter jurisdiction may be raised at any time, including for the first time on appeal. Forest Hills' motion for summary disposition was based on MCR 2.116(C)(10), which tests the factual support for a claim. The city and city assessor's response to Forest

Hills' motion was based on MCR 2.116(C)(4), which provides that summary disposition may be granted when the court lacks jurisdiction of the subject matter. An appellate court will review a trial court's summary disposition ruling under the correct rule, and MCR 2.116(C)(4) provided the proper standard for considering the city and city assessor's challenge to the circuit court's subject-matter jurisdiction. Although MCR 2.605(A)(1) permits a court to grant declaratory relief in a case of actual controversy, it does not limit or expand the court's subject-matter jurisdiction. MCL 205.731(a) provides that the Tax Tribunal has exclusive and original jurisdiction over a proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the property tax laws of this state. The tribunal has no jurisdiction to hold statutes invalid or to consider constitutional matters; only the circuit court may do so. Thus, if a challenge to a tax assessment rests solely on an argument that the tax assessment was made under the authority of an illegal statute, the circuit court would have jurisdiction over the matter. Merely couching a challenge to an assessment in constitutional terms, however, does not deprive the tribunal of its exclusive jurisdiction to consider a claim that the assessment was arbitrary or without foundation. Although Forest Hills did not directly challenge any particular assessment, it challenged the method the city assessor used to determine the assessments. In essence, Forest Hills' claim was an attempted appeal of its tax assessments, and the circuit court lacked jurisdiction to consider it. Although it did so for the wrong reason, the circuit court properly granted summary disposition in favor of the city and the city assessor.

Docket No. 305194 affirmed in part, reversed in part, and remanded to the Tax Tribunal for further proceedings.

Docket No. 306479 affirmed.

WHITBECK, P.J., concurring in part and dissenting in part, agreed with the majority in all respects except its determination regarding the Tax Tribunal's true-cash-value determination because he concluded that the tribunal adequately addressed the issue of economic obsolescence. In particular, he disagreed with the majority's characterization of the tribunal's finding concerning economic obsolescence. Whether the tribunal properly or improperly interpreted the hearing officer's determination of this issue was irrelevant because the Court of Appeals reviews only the tribunal's decision, not the hearing officer's. The tribunal's statement that the hearing officer correctly found that there was no economic

obsolescence, read in conjunction with relevant caselaw, was in fact a finding that there was no economic obsolescence, and competent evidence supported that finding. Judge WHITBECK concluded that remand on this point was unnecessary, but agreed with the rest of the majority's disposition of the appeals.

1. TAXATION — PROPERTY TAX — ASSESSMENTS — TRUE CASH VALUE — TAX TRIBUNAL DETERMINATION.

Const 1963, art 9, § 3 requires use of the true cash value of property to determine property taxes; MCL 211.27(1) defines "true cash value" in part as the usual selling price at the location where the property is at the time of the assessment, being the price that could be obtained for the property at private sale and not at auction or forced sale; although the Tax Tribunal should consider different approaches in determining true cash value, its duty is to determine an approach that most accurately reflects the property's value; the tribunal may reject both parties' theories of valuation in making this determination; it may not automatically accept the respondent's assessment in a property-tax proceeding, but it may adopt the assessed valuation on the tax rolls as its independent finding of true cash value when competent and substantive evidence supports doing so, as long as the tribunal does not afford the original assessment presumptive validity.

2. JURISDICTION — PROPERTY TAX — TAX TRIBUNAL — EXCLUSIVE JURISDICTION OVER ASSESSMENT CHALLENGES.

MCL 205.731(a) provides that the Tax Tribunal has exclusive and original jurisdiction over a proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the property tax laws of this state; the tribunal has no jurisdiction to hold statutes invalid or to consider constitutional matters; if a challenge to a tax assessment rests solely on an argument that the assessment was made under the authority of an illegal statute, the circuit court has jurisdiction over the matter; merely couching a challenge to an assessment in constitutional terms, however, does not deprive the tribunal of its exclusive jurisdiction to consider a claim that the assessment was arbitrary or without foundation.

*Hoffert & Associates, PC* (by *Myles B. Hoffert, David B. Marmon, Gregory M. Elliott,* and *Paige R. Harley*), for Forest Hills Cooperative.

*Steven K. Postema*, Corporation Counsel, and *Kristen D. Larcom*, Assistant Corporation Counsel, for the city of Ann Arbor and the Ann Arbor City Assessor.

Before: WHITBECK, P.J., and FITZGERALD and O'CONNELL, JJ.

FITZGERALD, J. These consolidated cases involve property tax assessments for nonprofit cooperative housing units located in the city of Ann Arbor (City) and owned by petitioner/plaintiff Forest Hills Cooperative. In Docket No. 305194, Forest Hills appeals as of right the June 1, 2011 judgment of the Michigan Tax Tribunal concerning the property tax assessments for tax years 2000 through 2009. In Docket No. 306479, Forest Hills appeals as of right the September 28, 2011 circuit court order granting summary disposition pursuant to MCR 2.116(I)(2) in favor of defendants—the City and the Ann Arbor City Assessor (City Assessor)—with respect to Forest Hills' constitutional claim concerning the property tax assessments.

I. FACTS AND PROCEDURAL HISTORY

A. DOCKET NO. 305194—TAX TRIBUNAL ACTION

The nonprofit housing cooperative property underlying this tax dispute consists of 39 residential buildings, one building with an office and meeting rooms, and one service and maintenance building on 30.78 acres in the City. The property is divided into eight parcels, each with an assigned number, for the purposes of assessing property taxes. One parcel is vacant land zoned for commercial uses.

Forest Hills obtained mortgage financing for the property through a federally subsidized program under

the National Housing Act of 1959 known as "Section 236." To obtain the financing, Forest Hills was required to enter into regulatory agreements with the United States Department of Housing and Urban Development (HUD).

In June 2000, Forest Hills filed a petition in the Tax Tribunal to challenge the assessments on the eight parcels for tax year 2000. Forest Hills alleged that the assessments were based on a true cash value of $7,622,000 for the eight parcels, but that the true cash value should be no more than $7,232,000. On September 29, 2000, the tribunal entered an order holding the case in abeyance until after the tribunal decided another factually similar case. The similar case was ultimately subject to an appeal in this Court. In 2007, this Court affirmed the tribunal's determinations in that case regarding the property tax assessments for a housing cooperative for tax years 1984 to 2002. See *Branford Towne Houses Coop v City of Taylor*, unpublished opinion per curiam of the Court of Appeals, issued April 19, 2007 (Docket No. 265398). In pertinent part, this Court rejected the petitioner's argument that the capitalization-of-income method for assessing property must be used to assess nonprofit housing cooperatives. *Id.* at 6.

On March 27, 2008, the Tax Tribunal entered an order removing this case from abeyance. By the time this case was heard by a hearing officer on January 12, 2010, and February 17, 2010, tax years 2001 through 2009 had been added to Forest Hills' petition. A stipulation of facts and exhibits were submitted to the hearing officer.

A supervising project manager employed by HUD testified that Section 236 housing is intended to create affordable housing for individuals with low or moderate

income by subsidizing the owner's mortgage payments for the property. In exchange for the subsidy, a mortgagor is required to sign a regulatory agreement that gives HUD various rights to inspect financial records, inspect the property, and approve alterations of the buildings. If the mortgage is paid off early, the mortgagor is required to sign a use agreement to preserve the restrictions on the property for the original term of the mortgage. If the property is sold, the restrictions would still apply. Although HUD would expect the property to be sold as a nonprofit housing cooperative, HUD would consider a transfer to a for-profit purchaser if a nonprofit purchaser could not be located.

The project manager testified that the mortgagor is also required to use an occupancy agreement, approved by HUD, for individuals to pay carrying charges to live in units of the housing cooperatives. If any individual leaves, some housing cooperatives buy back the individual's membership, while others require the individual to continue making payments until another acceptable person moves into the unit.

The managing agent at Forest Hills testified that Forest Hills repurchases units when a member leaves the housing cooperative. At the time of the hearing, 15 units were vacant, which represented a vacancy rate of approximately 5%. During past periods, a waiting list existed for residential units. The agent testified that each of the five mortgages for the Forest Hills property had a 40-year term with a due date in 2012 and that one mortgage was paid off in accordance with its amortization schedule in 2008. Another mortgage was paid off in 2009 according to its amortization schedule. The maturity dates for the five mortgage loans were in September 2008, October 2009, May 2010, February 2012, and May 2012. The federal subsidy to reduce the interest rate on

the mortgage notes from 7% to 1% was $287,186. HUD approved a request by Forest Hills in 2006 to retain excessive income in order to build a fund to replace aluminum siding. Forest Hills also obtained a flexible subsidy loan through HUD in 1999 for major structural repairs and replacements, payable on the maturity date of the mortgage notes.

Ernest Gargaro, an expert in accounting functions, testified that he prepared Forest Hills' proposed valuations using two methods that are purely computational in nature. One method used by Gargaro was a computation of the annual "transfer values" for particular types of residential units at Forest Hills, using Forest Hills' bylaws and occupancy agreements to obtain the subscription price for an individual to become a member of the housing cooperative and the value of the occupancy agreement. The other method used revenue from "tenants" and expenses in Forest Hills' annual, audited financial statements to arrive at Forest Hills' net operating income. Gargaro then applied a capitalization rate to the annual net operating income to arrive at a capitalization-of-income valuation for the individual tax parcels.

The City Assessor testified as an expert property appraiser and assessor. He concluded that the highest and best use of the property would be (1) a market-rate housing cooperative or (2) a conversion to condominiums. He opined that the cost of converting the property to a market-rate housing cooperative would be minimal and that Forest Hills was not prohibited from prepaying its mortgage loans. The City Assessor testified that he did not use an income approach to value the property on the basis of his determination that housing cooperatives are not typically held for investment. He found a cost approach inappropriate

on the basis of his determination that a typical buyer would not "take into consideration what something would cost initially to build or currently to build minus depreciation."

The City Assessor determined that ample sales data for housing cooperatives existed to allow use of a market approach to value most of the property, except that he made a deduction for his estimate of the cost of converting the property to a market-rate housing cooperative. He valued the "interest of the individual co-op interest and then basically summ[ed] that value of the individual units to come up with a value for the whole." If a "move-in" had occurred during the prior year, he considered this to have been a transfer and, accordingly, used the same amount for the taxable value and the assessed value of that residential unit during the following year. He believed that Michigan law allowed this "uncapping" of taxable value for partial transfers of the ownership of a housing cooperative. He valued the vacant parcel, which was zoned for commercial use, separately using a market approach to value.

The City Assessor indicated that the property had been assigned more than one parcel number for property tax assessment purposes because of the manner in which the property was bisected by streets. He testified that parcels typically are not contiguous across streets. Separate parcel numbers were not assigned to individual residential units because the property has only one owner and individual ownership interests are not generally "tracked." Additionally, the use of separate parcel numbers would be contrary to the manner in which Forest Hills allocates taxes to its members.

Following the hearing, the hearing officer determined the true cash values, assessed values, and taxable values for the property in a proposed opinion and judgment dated July 1, 2010. The hearing officer determined that shareholders and members of Forest Hills are residents of the units and that the highest and best use of the property was its current use. A cost-less-depreciation approach was used to value the property, as set forth in the City's property record cards for the developed property, and the hearing officer recommended a partial uncapping of the taxable value of each parcel when a unit is transferred. The assessed value of the vacant parcel was affirmed because Forest Hills did not offer any evidence that could be used to determine the value. The hearing officer determined values for each of the eight parcels for each of the disputed tax years. The parties were given notice that they had 20 days from entry of the proposed opinion to notify the Tax Tribunal in writing if they disagreed with the proposed opinion and the reason for any exceptions.

Both Forest Hills and the City filed exceptions to the hearing officer's proposed opinion and judgment. In an opinion and order dated July 1, 2011, the Tax Tribunal adopted the hearing officer's proposed opinion and judgment, except that a chart summarizing the "current values" of all the parcels that the hearing officer had prepared before making his determination regarding the values was amended to correctly reflect the true cash values for tax years 2007 and 2008.

### B. DOCKET NO. 306479—CIRCUIT COURT ACTION

On October 7, 2009, Forest Hills filed a complaint against the City and the City Assessor in circuit court. In Count I, Forest Hills sought a declaration

that MCL 211.27 is unconstitutional as applied to value its property and other similar property. Alternatively, Forest Hills sought a declaration that MCL 211.27 requires that its actual income or stock prices be used to determine the value of its property. Count I also included Forest Hills' constitutional claim, as set forth in ¶ 17 of the complaint, that "[i]f MCL 211.27 permits the procedures employed by the City Assessor, for the purpose of valuing the Forest Hills Property, then that statute violates Plaintiff's rights of due process and equal protection in contravention of U.S. Const. Amendment 14 and MCL [sic] Const. Art. 1, § § 1 and 17 . . . ." In Count II, Forest Hills alleged that the failure of the City and the City Assessor to use a valuation method that properly accounts for the effect of its regulatory agreement with HUD violates 42 USC 1983. In Count III, Forest Hills sought injunctive relief.

On October 27, 2009, the City and the City Assessor filed a joint motion for summary disposition under MCR 2.116(C)(4) on the ground that the Tax Tribunal had exclusive jurisdiction to consider Forest Hills' challenge to the valuation method used to determine its property taxes. At a hearing on November 18, 2009, Forest Hills' counsel argued that Forest Hills should have a right to establish that the statute is facially invalid on the basis of the facts pleaded in the complaint. The circuit court determined that it had jurisdiction to consider whether the statute was unconstitutional as applied and pleaded in Count I of the complaint, but not to consider Counts II and III. The circuit court also held the case in abeyance pending a final decision by the tribunal regarding Forest Hills' petition.

After the Tax Tribunal rendered its decision regarding the valuation of the Forest Hills property, Forest

Hills moved for summary disposition under MCR
2.116(C)(10) on September 1, 2011, seeking a declaration that MCL 211.27(4)[1] requires the use of either the
capitalization of its actual income or "share transfer
values" to value its property. Alternatively, Forest Hills
sought a determination that MCL 211.27(4) is unconstitutional, at least as applied to it and other similarly
situated properties.

In a response filed on September 21, 2011, the City
and the City Assessor sought summary disposition in
their favor under MCR 2.116(C)(4) and (I)(2). They
asserted that the circuit court could accept the allegations in the complaint as true for purposes of the
motion, but should hold that it lacks subject-matter
jurisdiction to address Forest Hills' claim because it is
nothing more than a challenge to a property tax assessment framed in constitutional terms. At a hearing on
September 28, 2011, the circuit court denied Forest
Hills' motion for summary disposition and granted
summary disposition in favor of the City and the City
Assessor under MCR 2.116(I)(2).

## II. TRUE CASH VALUE

### A. ISSUE PRESERVATION

Initially, we note that it is unclear from Forest Hills'
principal brief whether it is challenging the hearing
officer's proposed opinion and judgment or the Tax
Tribunal's decision to adopt the hearing officer's opinion and judgment, as corrected, as the final opinion and
judgment. From Forest Hills' reply brief, it appears that
Forest Hills' concern is with the hearing officer's pro-

---

[1] The relevant subsection is now MCL 211.27(5). See MCL 211.27, as
amended by 2013 PA 162, effective November 12, 2013. The text of the
subsection was not changed. Throughout this opinion we will refer to the
provision as MCL 211.27(4).

posed opinion and judgment. The relevant decision in this case, however, was rendered by the Tax Tribunal because it was required to make its own de novo determinations. To the extent that Forest Hills' argument is directed at the hearing officer's proposed opinion, the argument is not preserved for appeal because Forest Hills failed to file an exception to the proposed opinion on the ground that it essentially rubber-stamped the "true cash value" on the assessment tax roll. See *Attorney General v Pub Serv Comm #1*, 136 Mich App 52, 56; 355 NW2d 640 (1984). Although this Court need not address an unpreserved issue, it may overlook preservation requirements when, as in this case, the issue involves a question of law and the facts necessary for its resolution have been presented. *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 387; 803 NW2d 698 (2010).

### B. STANDARD OF REVIEW

Const 1963, art 6, § 28, cl 2 provides:

> In the absence of fraud, error of law or the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation.

An "error of law" occurs within the meaning of this constitutional provision if the Tax Tribunal's decision is not supported by competent, material, and substantial evidence on the whole record. *Great Lakes Div of Nat'l Steel Corp v Cit of Ecorse*, 227 Mich App 379, 388; 576 NW2d 667 (1998). Stated otherwise, "[t]he Tax Tribunal's factual findings are final if they are supported by competent, material, and substantial evidence on the whole record." *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527; 817 NW2d 548 (2012). If there is no

factual dispute and fraud is not alleged, appellate review is limited to whether the Tax Tribunal made an error of law or adopted a wrong legal principle. *Id*. at 527-528. When an issue of statutory construction is involved, appellate review is de novo. *Id*. at 528.

C. ANALYSIS

Forest Hills argues that the Tax Tribunal violated its statutory duty to make an independent determination of the true cash value of the property by instead simply rubber-stamping the "true cash value" on the tax roll.

Const 1963, art 9, § 3 requires that the "true cash value" be used to determine property taxes. *Pontiac Country Club v Waterford Twp*, 299 Mich App 427, 434; 830 NW2d 785 (2013). In general, true cash value is synonymous with fair market value. *Id*. It is statutorily defined, in part, as "the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale." MCL 211.27(1). Although the Tax Tribunal should consider different approaches in determining true cash value, "correlating, reconciling, and weighing the values derived under various approaches," the tribunal's duty is to determine an approach that most accurately reflects the value of the property. *Pontiac Country Club*, 299 Mich App at 435. The Tax Tribunal is free to reject both parties' theories of valuation in making this determination. *Great Lakes*, 227 Mich App at 390.

The Tax Tribunal may not automatically accept a respondent's assessment in a property-tax proceeding. *Id*. at 409. Nonetheless, "the Tribunal may adopt the assessed valuation on the tax rolls as its independent

finding of true cash value when competent and substantive evidence supports doing so, as long as it does not afford the original assessment presumptive validity." *Pontiac Country Club*, 299 Mich App at 435-436. "Substantial evidence must be more than a scintilla of the evidence, although it may be substantially less than a preponderance of the evidence." *Great Lakes*, 227 Mich App at 388-389. This Court has stated that competent and substantial evidence will support the Tax Tribunal's decision if the decision is within the range of valuations in evidence. *Pontiac Country Club*, 299 Mich App at 436.

The petitioner has the burden of establishing the property's true cash value. MCL 205.737(3); *Pontiac Country Club*, 299 Mich App at 435. The burden of proof encompasses both the burden of persuasion, which never shifts during the course of the hearing, and the burden of going forward with evidence, which may shift to the opposing party. *President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 631; 806 NW2d 342 (2011). In a property tax dispute, the petitioner must prove by the greater weight of the evidence that the disputed assessment was too high on the basis of the Tax Tribunal's findings of true cash value. *Great Lakes*, 227 Mich App at 409-410.

1. THE HEARING OFFICER'S PROPOSED OPINION AND JUDGMENT

In this case, the hearing officer decided that a cost-less-depreciation approach was the most accurate valuation method for the improved parcels after rejecting other approaches proposed by the parties and reviewing the property cards that contained the City's cost information. The hearing officer found it "possible that functional or economic obsolescence should be estimated" in applying this approach, but also determined

that there was "insufficient evidence in this case to allow for an independent estimate of depreciation from these sources." He also determined that "where the vacancy rate has varied between 0% and 5% for the years at issue, this suggests that the cost approach could be used with no economic obsolescence applied."

The hearing officer affirmed the assessments for the vacant parcel because Forest Hills had not offered proofs specific to the vacant parcel and, therefore, he had no evidence from which to make an independent determination regarding the value. The hearing officer found the City's proofs insufficient for him to make an independent determination. The property cards for this parcel were introduced at the hearing. As with the hearing officer's proposed opinion, the property cards indicated a significant increase in true cash value, which increased from $45,200 in 2004 to $611,800 in 2005, although the taxable value in 2005 was only $15,031. The hearing officer addressed the property record cards in his opinion by noting that the cards set forth the cost-less-depreciation approach, which the assessor relied on to determine the true cash value of the parcels, to determine the assessed values. The City Assessor testified at the hearing that the vacant parcel was "grossly under assessed" before 2005. The assessor arrived at a valuation of $824,000 for each year under the market approach to valuation for purposes of the proceedings in the Tax Tribunal.

2. THE TAX TRIBUNAL'S OPINION AND JUDGMENT

The Tax Tribunal adopted the hearing officer's proposed opinion and judgment with respect to its determinations of the true cash values for each parcel. Although the Tax Tribunal was not presented with the specific issue raised in this appeal, it did consider an

issue raised by Forest Hills regarding the hearing officer's failure to make any adjustment for obsolescence. The tribunal stated:

> The [hearing officer] utilized the cost approach in valuing the subject property. The parties stipulated that the vacancy rate from 2004 through 2009 was approximately 5%, but that there were years when the rate was 0 and there was a waiting list. Given this, the [hearing officer] was correct in finding that, under *Meadowlanes* [*Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473; 473 NW2d 636 (1991)], there was no economic obsolescence.

### 3. ANALYSIS—IMPROVED PARCELS

The cost-less-depreciation approach underlying the valuation for the improved parcels is, in reality, a type of comparative or market-data approach to value, which generally considers the land to be unimproved, requires the development of a replacement cost for improvements, and makes adjustments for depreciation to reflect the fact that an old or used property is usually less valuable than a new one. *Antisdale v City of Galesburg*, 420 Mich 265, 276 n 1; 362 NW2d 632 (1984). It is not necessary that there be an actual market for the property because "valuation can be determined strictly on a hypothetical basis, with the hypothetical buyer looking at the costs of building a new facility to determine the usual price of an existing facility even if a real buyer would not consider building such a facility." *Great Lakes*, 227 Mich App at 403. In *Meadowlanes*, 437 Mich at 484 n 18, our Supreme Court described the cost-less-depreciation approach as follows:

> Under the cost approach, true cash value is derived by adding the estimated land value to an estimate of the current cost of reproducing or replacing improvements and then

deducting the loss in value from depreciation in structures, i.e., physical deterioration and functional or economic obsolescence.

Functional obsolescence refers to "a loss of value brought about by failure or inability of the assessed property to provide full utility." *Meijer, Inc v City of Midland*, 240 Mich App 1, 4 n 4; 610 NW2d 242 (2000). For instance, a poor floor plan can cause functional obsolescence, although it is possible that the use of a replacement-cost approach might eliminate the need to consider some sources of functional obsolescence. *Teledyne Continental Motors v Muskegon Twp*, 145 Mich App 749, 755-756; 378 NW2d 590 (1985). Economic obsolescence refers to a "loss of value occasioned by outside forces." *Fisher-New Ctr Co v State Tax Comm*, 380 Mich 340, 362; 157 NW2d 271 (1968), vacated on other grounds on reh 381 Mich 713 (1969). The measure of allowable obsolescence is a subjective determination that demands an exercise of judgment. *Fisher-New Ctr*, 380 Mich at 362-363. "Even a slight variation in the percentage of depreciation or of obsolescence may produce a considerable difference in valuation." *Id.* at 369.

In *Meadowlanes*, 437 Mich at 503, the Supreme Court indicated that when using the cost-less-depreciation approach, economic obsolescence should be calculated in light of the property's highest and best use.[2] The highest and best use of the property in that case was a federally subsidized housing complex financed under Section 236, which also provided rental assistance subsidies to tenants. *Id.* at 477. Considered in the context of this highest and best use, our Supreme Court determined:

---

[2] The highest-and-best-use concept recognizes that "the use to which a prospective buyer would put the property will influence the price that the buyer would be willing to pay for it." *Great Lakes*, 227 Mich App at 408.

If there is a market for subsidized housing at the location where it is built and a sufficient number of individuals who can afford to pay the rent required, then there will be little economic obsolescence under this approach. [*Id.* at 503.]

The hearing officer in this case appropriately considered the economic obsolescence principles in *Meadowlanes* in his proposed opinion. But unlike the Tax Tribunal, and contrary to the tribunal's characterization of the hearing officer's opinion on this issue, the hearing officer did not find that economic obsolescence did not exist. As indicated previously, he found that "[w]hile it is possible that functional or economic obsolescence should be estimated, there is insufficient evidence in this case to allow for an independent estimate of depreciation from these sources." And while the hearing officer's determinations regarding true cash value were within the valuation evidence ranges, considering his express determination that he could not make an independent estimate of functional or economic obsolescence, we conclude that the hearing officer partially violated the rule against according presumptive validity to an assessment.

Arguably, the Tax Tribunal corrected this error when it determined that the evidence regarding the minimal vacancy rate supports a finding of "no economic obsolescence" because a Tax Tribunal's review of a proposed opinion is de novo. *President Inn*, 291 Mich App at 635-636. And while all relevant circumstances that tend to affect value should be considered, "there is no rule of law that requires the Tax Tribunal to quantify every possible factor affecting value." *Great Lakes*, 227 Mich App at 398-399.

But considering that the Tax Tribunal was operating under a misconception of the hearing officer's ultimate

finding, failed to address the issue of functional obsolescence, and ultimately adopted the hearing officer's proposed opinion and judgment, with the exception of a correction that did not relate to the hearing officer's determination regarding obsolescence, we conclude that the Tax Tribunal committed an error of law. Accordingly, we remand this case to the Tax Tribunal for the purpose of making an independent determination of the amount of functional and economic obsolescence, if any, to be used in determining the true cash value of the improved parcels under the cost-less-deprecation approach and for other proceedings consistent with this determination. If necessary, the Tax Tribunal may reopen the proofs to resolve this issue and make legally supportable determinations regarding functional and economic obsolescence. See *Great Lakes*, 227 Mich App at 433, and *Jones & Laughlin Steel Corp v City of Warren*, 193 Mich App 348, 357; 483 NW2d 416 (1992).

### 4. ANALYSIS—VACANT PARCEL

The hearing officer expressly determined that he had insufficient evidence to make an independent determination of value, and the Tax Tribunal adopted the hearing officer's proposed opinion without addressing this issue. As indicated in *Pontiac Country Club*, 299 Mich App at 435, even when a petitioner fails to show that an assessment was too high, the Tax Tribunal is required to make an independent determination of true cash value using the approach that most accurately reflects the value of the property.

Considering the hearing officer's express determination that he could not make an independent determination of the true cash value of the vacant parcel, the Tax Tribunal committed an error of law by adopting the proposed opinion regarding this parcel. Accordingly, the

case is remanded to the Tax Tribunal for the purpose of making an independent determination of the true cash value of the vacant parcel and for other proceedings consistent with this determination. If necessary, the Tax Tribunal may reopen the proofs to resolve this issue and make legally supportable determinations regarding the vacant parcel. See *Great Lakes*, 227 Mich App at 433, and *Jones & Laughlin*, 193 Mich App at 357.

### III. APPROACH TO VALUE

Forest Hills argues that the Tax Tribunal made an error of law in applying MCL 211.27. This issue largely concerns whether there is evidence that could be used by the tribunal to apply a capitalization-of-income approach to value, which is one of the three most common approaches to value. *Great Lakes*, 227 Mich App at 390. This approach to value is based on the premise that a property's value is related to how much income the property can earn. *Antisdale*, 420 Mich at 276 n 1. Because the main benefit to the owner is the future net income that the property can earn, the property's worth is largely based on the income, although the net amount receivable from the property when the ownership is terminated is also a benefit. *Id.* The capitalization-of-income approach "measures the present value of the future benefits of property ownership by estimating the property's income stream and its resale value (reversionary interests) and then developing a capitalization rate which is used to convert the estimated future benefits into a present lump-sum value." *Meadowlanes*, 437 Mich at 485 n 20.

This issue requires an interpretation of property tax laws. In general, a court's goal in construing a statute is to give effect to the Legislature's intent. *Mich Props*, 491 Mich at 528. "When considering the correct inter-

pretation, the statute must be read as a whole. Individual words and phrases, while important, should be read in the context of the entire legislative scheme." *Id.* (citation omitted). Unambiguous statutory language is enforced as written. *Signature Villas, LLC v Ann Arbor*, 269 Mich App 694, 699; 714 NW2d 392 (2006). But "courts must pay particular attention to statutory amendments, because a change in statutory language is presumed to reflect either a legislative change in the meaning of the statute itself or a desire to clarify the correct interpretation of the original statute." *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009).

While an ambiguity in a tax statute is construed in favor of the taxpayer, *Kelly Servs, Inc v Dep't of Treasury*, 296 Mich App 306, 311; 818 NW2d 482 (2012), tax exemptions are narrowly construed in favor of the taxing authority because they reduce the amount of tax imposed, *ONE's Travel Ltd v Dep't of Treasury*, 288 Mich App 48, 55; 791 NW2d 521 (2010). Statutory language is ambiguous if it irreconcilably conflicts with another provision or is equally susceptible to more than one meaning. *ONE's Travel*, 288 Mich App at 54-55.

Forest Hills argues that the Legislature intended to establish special rules for determining the true cash value of a nonprofit cooperative when it amended MCL 211.27 after our Supreme Court issued decisions regarding the determination of true cash value for rental properties in *CAF Investment Co v State Tax Comm*, 392 Mich 442; 221 NW2d 588 (1974) (*CAF I*), and *CAF Investment Co v Saginaw Twp*, 410 Mich 428; 302 NW2d 164 (1981) (*CAF II*).

At the time the Court decided *CAF I*, MCL 211.27 defined "cash value" as follows for purposes of determining "true cash value":

" 'Cash value', means *the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale.* Any sale or other disposition by the state or any agency or political subdivision of lands acquired for delinquent taxes or any appraisal made in connection therewith shall not be considered as controlling evidence of true cash value for assessment purposes. In determining the value the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, *present economic income* of structures, including farm structures and present economic income of land when the land is being farmed or otherwise put to income producing use, quantity and value of standing timber, water power and privileges, mines, minerals, quarries, or other valuable deposits known to be available therein and their value." [*CAF I*, 392 Mich at 448-449, quoting MCL 211.27(1), as amended by 1973 PA 109.]

The phrase "present economic income" was not statutorily defined, but the Supreme Court determined that it meant "actual income." *CAF I*, 392 Mich at 454. When applying a capitalization-of-income approach to value rental property, this meant that consideration must be given to actual rental income, rather than some hypothetical rental income, although it would still be appropriate to make adjustments to the actual income for such factors as current market conditions. *Id.* at 455. It was also possible to conclude, on the basis of the particular facts of the case, that a capitalization-of-income approach was not a reliable indicator of value. *Id.* at 456. The Supreme Court explained:

We point out that "consideration" of the enumerated factors under MCLA 211.27; MSA 7.27 does not require that the taxing authority determine projected income under the income capitalization approach upon any one or all of the enumerated factors ("economic" or actual income being one of those factors) so long as the valuation com-

ports with the statute's definition of true cash value as "usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price which could be obtained for the property at private sale, and not at forced or auction sale." "Consideration" of the various factors may well indicate that the application of some or all enumerated factors is inappropriate. For example, in the event lease rental (in statutory parlance a component of "economic income") were not arrived at on the basis of arm's length bargaining or in other respects had no relationship to "usual selling price", as statutorily defined, it would be appropriate for the taxing authority to ignore lease rental as a component of valuation. It is only because in this case the record indicates that long-term lease rental fairly reflects economic circumstances at the outset of the lease term and bears a demonstrable relation to true cash value that we require its consideration. [*Id.* at 456 n 6.]

In 1981, our Supreme Court again determined in *CAF II*, 410 Mich at 458, that actual income must be used when applying the capitalization-of-income approach to value property.

In 1982 PA 539, effective March 30, 1983, the Legislature established a statutory definition of "present economic income" in MCL 211.27(4) for leased or rented property. This Court indicated in *Carriage House Coop v City of Utica*, 172 Mich App 144, 149; 431 NW2d 406 (1988), that the amendment was an apparent attempt to abrogate *CAF I* and *CAF II*. The amended statute provided:

"As used in subsection (1), 'present economic income' means *in the case of leased or rented property* the ordinary, general, and usual economic return realized from the lease or rental of property negotiated under current, contemporary conditions between parties equally knowledgeable and familiar with real estate values. The actual income generated by the lease or rental of property shall not be the

controlling indicator of its cash value in all cases." [*Id.*, quoting MCL 211.27(4), as amended by 1982 PA 539 (emphasis added).]

1983 PA 254, effective December 29, 2003, amended MCL 211.27(4) to add the following three sentences to the end of the subsection:

"This subsection shall not apply to property when subject to a lease entered into prior to January 1, 1984 for which the terms of the lease governing the rental rate or tax liability have not been renegotiated after December 31, 1983. This subsection shall not apply to a nonprofit housing cooperative when subject to regulatory agreements between the state or federal government entered into prior to January 1, 1984. As used in this subsection, "nonprofit cooperative housing corporation" means a nonprofit cooperative housing corporation which is engaged in providing housing services to its stockholders and members and which does not pay dividends or interest upon stock or membership investment but which does distribute all earnings to its stockholders or members." [*Carriage House*, 172 Mich App at 149-150, quoting MCL 211.27(4), as amended by 1983 PA 254 (emphasis omitted).]

MCL 211.27 was subject to several additional amendments after 1983, including an amendment during the tax years of 2000 through 2009 at issue in this case that changed the phrase "cash value" to "true cash value." As amended by 2002 PA 744, effective December 30, 2002, MCL 211.27 provided, in pertinent part:

(1) *As used in this act, "true cash value" means the usual selling price at the place where the property to which the term is applied is at the time of assessment, being the price that could be obtained for the property at private sale, and not at auction sale except as otherwise provided in this section, or at forced sale.* The usual selling price may include sales at public auction held by a nongovernmental agency or person if those sales have become a common method of acquisition in the jurisdiction for the

class of property being valued. The usual selling price does not include sales at public auction if the sale is part of a liquidation of the seller's assets in a bankruptcy proceeding or if the seller is unable to use common marketing techniques to obtain the usual selling price for the property. A sale or other disposition by this state or an agency or political subdivision of this state of land acquired for delinquent taxes or an appraisal made in connection with the sale or other disposition or the value attributed to the property of regulated public utilities by a governmental regulatory agency for rate-making purposes is not controlling evidence of true cash value for assessment purposes. *In determining the true cash value, the assessor shall also consider* the advantages and disadvantages of location; quality of soil; zoning; existing use; *present economic income of structures*, including farm structures; *present economic income of land if the land is being farmed or otherwise put to income producing use*; quantity and value of standing timber; water power and privileges; and mines, minerals, quarries, or other valuable deposits known to be available in the land and their value. . . .

\* \* \*

(4) As used in subsection (1), "present economic income" means for leased or rented property the ordinary, general, and usual economic return realized from the lease or rental of property negotiated under current, contemporary conditions between parties equally knowledgeable and familiar with real estate values. The actual income generated by the lease or rental of property is not the controlling indicator of its true cash value in all cases. This subsection does not apply to property subject to a lease entered into before January 1, 1984 for which the terms of the lease governing the rental rate or tax liability have not been renegotiated after December 31, 1983. *This subsection does not apply to a nonprofit housing cooperative subject to regulatory agreements between the state or federal government entered into before January 1, 1984. As used in this subsection, "nonprofit cooperative housing corporation"*

*means a nonprofit cooperative housing corporation that is
engaged in providing housing services to its stockholders
and members and that does not pay dividends or interest
upon stock or membership investment but that does distrib-
ute all earnings to its stockholders or members.* [Emphasis
added.][3]

Forest Hills argues on appeal that the most recent
statutory definition of "present economic income" does
not apply to it because it is a nonprofit housing coop-
erative that had regulatory agreements executed before
January 1, 1984. Forest Hills therefore concludes that
the rationale in *CAF I*, 392 Mich 442, and *CAF II*, 410
Mich 428, should be used to define "present economic
income" and, accordingly, that it means "actual in-
come." Forest Hills also argues that MCL 211.27(4)
would require application of a capitalization-of-income
approach to value.

The phrase "present economic income" is defined in
MCL 211.27(4) "for leased or rented property." Forest
Hills, as a nonprofit cooperative, is expressly excluded
from this definition. "When statutory provisions are
construed by the court and the Legislature reenacts the
statute, it is assumed that the Legislature acquiesced to
the judicial interpretation." *GMAC LLC v Dep't of
Treasury*, 286 Mich App 365, 373; 781 NW2d 310
(2009). Therefore, with the exception of the statutory
definition provided for "leased or rented property" in
MCL 211.27(4), "present economic income" means "ac-
tual income." Therefore, "present economic income," as
used in MCL 211.27(1), is properly construed to mean
actual income.

---

[3] After the tax years at issue in this case, 2012 PA 409, effective
December 20, 2012, amended the list for the assessor to consider by
deleting "mines" and adding the phrase "not otherwise exempt under
this act" after "deposits" in the last quoted sentence in MCL 211.27(1).

Nonetheless, there is no merit to Forest Hills' argument that this means that the Tax Tribunal was *required* to use a capitalization-of-income approach to value. MCL 211.27(1) does not require assessments based on a particular valuation method. MCL 211.27(1) states that "[i]n determining the true cash value, the assessor shall also consider the advantages and disadvantages of . . . present economic income of structures . . . ." (Emphasis added.) "Consider" is commonly defined as "to think carefully about, [especially] in order to make a decision; contemplate; ponder." *Random House Webster's College Dictionary* (2005) Caselaw verifies that no particular valuation method is required for real property assessments. Indeed, *CAF I*, 392 Mich at 456, stated; "[T]here may be such facts, peculiar to the circumstances under consideration, as would indicate that the income capitalization approach is too speculative to be a reliable indicator of valuation. In such circumstances the tax assessor may base his assessment upon a more reliable method of valuation." *CAF II*, 410 Mich at 461, quoted that observation. As stated in *Meadowlanes*, 437 Mich at 484: "The Legislature did not direct that specific methods be used. Thus, the task of approving or disapproving specific valuation methods or approaches has fallen to the courts." It follows that the material question in this issue is whether the Tax Tribunal adopted a wrong principle in rejecting Forest Hills' proposed capitalization-of-income approach for improved parcels or perhaps the alternative "transfer value" approach.

Forest Hills' expert, Gargaro, summarized his computations as follows:

> I took the financial statements for each year, the audited financial statements, and from those statements for each year took the following values: total rental revenue plus total tenant charges for each year, which came to total

revenue. And then took operating expenses as classified in the financial statements under the headings of administrative, utilities, operating, maintenance and taxes and insurance, and accumulated those and reduced them by the property taxes paid, to come up with a net operating income.

And then took the net operating income and ascribed a capitalization rate to it, and added to that an additional capitalization rate as it related to the property tax component, since they're ad valorem taxes. And came up with a total capitalization rate, which then I used the cap rate to derive the proposed true cash value, and then cut that in half for the proposed assessment for each year under the disclosure.

He used this method for both the improved and vacant parcels. The total proposed true cash value for the improved and vacant parcels under this approach varied from tax year to tax year. As set forth in the hearing officer's proposed opinion, the lowest proposed true cash value was $2,149,320 for tax year 2006. The highest proposed true cash value was $4,183,400 for tax years 2004 and 2005.

On appeal, Forest Hills relies on *Pinelake Housing Coop v Ann Arbor*, 159 Mich App 208; 406 NW2d 832 (1987), to argue that its proposed approach should have been used. Forest Hills was one of the two petitioner/housing cooperatives in that case. *Id.* at 210. The tax years in issue were 1981 through 1984. *Id.* This Court approved a capitalization-of-income approach to value that essentially treated membership fees like large security deposits and "capitalized" the annual mortgage payments for the housing project. *Id.* at 225-226. This Court stated, in part:

To determine net income under the income approach, operating expenses are subtracted from gross income. However, mortgage payments are not considered to be an

operating expense, but rather an expense of financing the property. Because the annual budget process makes gross income a function of expenses so that the project generates no cash flow, the result is that when actual expenses are subtracted from actual income, all that is basically left are the annual payments on the mortgage. The concern is that the capitalization of the total annual mortgage payment has no relationship to the property's value.

However, it is our opinion that such a result nevertheless represents the values that such properties possess. Such projects, when solvent, are able to generate sufficient income to retire the mortgage debt at the one percent effective rate. The ability of a property to generate sufficient income to pay off its underlying financing is value. The fact that "net income" . . . represents little more than the annual debt service is simply an expression of our belief that under the regulatory restrictions such projects have little other value. [*Pinelake*, 159 Mich App at 225.]

In this case, the hearing officer considered, but rejected, Forest Hills' proposed capitalization-of-income approach, which used actual "carrying charges" in lieu of rent, because it was not a credible indicator of value. The hearing officer found this approach flawed because it did not take into account the positive value influence of the subsidized mortgage, but found that, even if an adjustment were made, the evidence was "insufficiently persuasive to support adoption of [Forest Hills'] overall capitalization rate." The hearing officer had stated earlier, when stating his findings of fact with respect to the testimony of Forest Hills' expert:

32. Mr. Gargaro testified that "he didn't see where frankly the income approach applied." He stated that he used the statutory "carve-out approach" and did the mathematical computations set forth in [Exhibit] P-2, which purports to be an income approach to value using monthly carrying charges as gross potential income.

33. Mr. Gargaro stated that the capitalization rates used in [Forest Hills'] "income approach" were taken from a "sheet of paper in the office" that included listings of capitalization rates for similar properties. He did not testify as to what type of properties the capitalization rates were intended to apply. [Citation omitted.]

The hearing officer also determined that the value of the decision in *Pinelake* had been severely diminished by the decision in *Meadowlanes* that the subsidized mortgage and other positive value influences should be considered. In *Meadowlanes*, 437 Mich at 501, our Supreme Court held that "in computing the true cash value of real property, the Michigan Tax Tribunal may take into account the value, if any, of a federal government mortgage subsidy."

The Tax Tribunal concurred in the hearing officer's determination that the cost approach, and not the income approach, provided the most accurate determination of valuation. It specifically addressed the *Pinelake* decision, stating:

[Forest Hills] argues that the court's decision in *Pinelake* preserved its interpretation of MCL 211.27(4). In other words, [Forest Hills] argues that the Tribunal should accept its use of "actual monthly service charges as analogous to rent, and the analogy of the membership fees as security deposits." The Tribunal disagrees and finds that while actual monthly service charges and membership fees may be *considered* in valuing the subject property under an income capitalization approach, as suggested in *Meadowlanes*, utilizing these figures will not result in a reasonable estimate of the property's true cash value. This is due to the fact that actual monthly service charges and membership fees *will not generate income*. Instead, they are established to solely cover the expenses of operating the property and insuring that the property is maintained. According to the Appraisal Institute, *The Dictionary of Real Estate Appraisal*, (Chicago: 5th ed, 2010), p99, the

> income capitalization approach is "[a] set of procedures
> through which an appraiser derives a value for an *income-
> producing property* by converting its anticipating benefits
> (cash flows and reversion) into property value." "Income
> producing property" is defined as "[a] type of property
> created primarily to produce monetary income." (*Id.*, p99)
> In this case, there is no doubt that the subject property was
> not created to produce income. [Citation omitted.]

Forest Hills has failed to establish any wrong prin-
ciple applied by the Tax Tribunal in making this deter-
mination. Clearly, consideration was given to the ap-
proach in *Pinelake* in light of our Supreme Court's
subsequent determination regarding the method for
valuing federally subsidized housing in *Meadowlanes*,
437 Mich 473. Considering the whole record, including
the meager evidence offered by Forest Hills through its
expert to justify the capitalization rate and the finding
that the highest and best use of the property was its
current use, we conclude that the Tax Tribunal did not
err by failing to base the determination of true cash
value on Forest Hills' proposed variation from the
common capitalization-of-income approach to value.

Ordinarily, courts will respect the existence of a corpo-
ration as separate from its shareholders. *Wells v Firestone
Tire & Rubber Co*, 421 Mich 641, 650; 364 NW2d 670
(1984). But if property is to be valued on the basis of its
use as a nonprofit housing cooperative that is owned by its
occupants through their shareholder or membership in-
terests in the nonprofit corporation, an accurate valuation
would require some consideration of the value of the
physical structures and land that benefit the occupants,
and not simply the net operating income produced
through payments made by the occupants that are used to
make loan payments or the value of federal subsidies that
reduce interest on the loans. Indeed, as discussed in Part
IV of this opinion, the Legislature treats the shareholder-

occupants as having a transferrable ownership for purposes of determining the taxable value of nonprofit housing cooperatives. Consistently, it is appropriate to consider the benefits of housing ownership available to those shareholder-occupants.

In the alternative, Forest Hills contends that the tribunal wrongfully rejected the "transfer value" approach to value. Article III, § 8(d) of the corporate bylaws for Forest Hills contains a transfer-value formula for the board of directors to purchase a membership in Forest Hills, which consists of the sum of four items: (1) the subscription price of the first occupant of the unit, (2) the "Value of Occupancy Agreement," (3) certain improvements installed at the expense of the member, and (4) amounts designated in a table, which depend on the number of bedrooms in a unit and the age of the mortgage for a particular section of the housing project.

Article 1 of the occupancy agreement requires that a member pay the member subscription price and "the Initial Payment under the Occupancy Agreement ... (which Initial Payment under the Occupancy Agreement is referred to in the By Laws of the Corporation as the 'Value of Occupancy Agreement')."

Forest Hills' proposed transfer-value approach resulted in a gradual increase in the proposed true cash value for each tax year from 2000 to 2009 for the improved and vacant parcels. The hearing officer indicated in his proposed opinion that it ranged from $1,380,210 for 2000 to $2,595,540 for 2009. He indicated in a chart that Forest Hills' proposed transfer value for 2000 was $1,461,360.[4]

---

[4] Forest Hills asserts that the range was $1,461,360 for 2000 to $2,595,540 for 2008, but the precise calculations are not material to a proper resolution of this issue.

Gargaro gave the following testimony to explain his computations:

> I went to the bylaws and occupancy agreements, and the bylaws have the transfer of value formula in them and confirmed numbers from the Article 3, Section 5(d) [sic] of the bylaws. And then went to the occupancy agreement, Article 1 to get the subscription price number, and the value of the occupancy agreement, and used the numbers in those documents to come up with the transfer value for each year.

Gargaro later testified that the transfer value for a particular occupant depends on the number of bedrooms of the unit occupied and the "section" of the housing cooperative. For instance, he used $430 as the transfer value for the first four tax years of units located in Sections 1 and 2. He had been given a "transfer value table" to make his computations, and assumed that it had been prepared by Forest Hills.

The hearing officer found Forest Hills' proposed transfer-value approach even less persuasive than the proposed capitalization-of-income approach. He determined:

> The consideration that a person pays to acquire the right to occupy a unit, referred to as the "transfer value," bears no relation to the "fair market value" of the property rights acquired. The seller is not free to market the unit for the highest price that the market will bear, and the buyer is prohibited from paying an amount greater than the "transfer value" provided for in the regulatory agreement. Therefore, there is a market for units in a coop, but the price paid to acquire a unit is not equal to "fair market value."

> The buyer of a coop share receives the right to occupy a good quality dwelling unit, and effectively assumes a portion of a favorable mortgage with a federally subsidized effective interest rate of 1%. The buyer receives many

benefits of private home ownership, such as federal income tax deductions for mortgage interest. *It is fair to say that the buyer receives more than he or she bargains for, by virtue of the benefits conferred by the federal section 236 program.* Units in a cooperative are part of a real estate market in that rights to the unit are exchanged for money. However, the actual consideration paid (transfer value) bears no relation to the "fair market value" of each unit. This requires rejection of [Forest Hills'] theory that [true cash value] should equal the "transfer value."

The Tax Tribunal also rejected the "transfer value," "combined buy-out prices," or "actual sales price" approach to value when considering Forest Hills' exceptions to the hearing officer's proposed opinion, although its decision focused on Forest Hills' argument that the Tax Tribunal was required to accept its capitalization-of-income approach.

Forest Hills has failed to establish that the Tax Tribunal adopted a wrong principle by not using the proposed transfer-value approach. As indicated in the hearing officer's proposed opinion, which was adopted by the Tax Tribunal, the consideration paid by Forest Hills to an occupant moving out of a unit does not measure the benefits of home ownership associated with the unit. Therefore, transfer value is not equivalent to fair market value.

IV. UNCAPPING TAXABLE VALUE

Forest Hills argues that the Tax Tribunal violated MCL 211.27a(6)(j) by prorating the uncapped taxable value associated with a transfer of a unit in the housing cooperative to units that did not transfer. It contends that the increase in taxable value must be confined to the transferred unit and, therefore, that separate parcel numbers must be assigned to each unit.

Underlying this issue is a provision of the General Property Tax Act (GPTA), MCL 211.27a, enacted by the Legislature to implement an amendment of Const 1963, art 9, § 3 established by Proposal A of 1994. As explained in *Mich Props*, 491 Mich at 529-530:

> Proposal A places a cap on the taxable value of a property so that, based on the previous year's taxable value, any yearly increase in taxable value is limited to either the rate of inflation or 5 percent, whichever is less. That cap on taxable value applies only to the current owner of the property, and the property's taxable value is uncapped when the property is transferred. The uncapped taxable value for the year after the transfer sets a new baseline value that is subject to a new cap. The GPTA is the enabling legislation that carries out the edicts of Proposal A.

As amended by Proposal A, Const 1963, art 9, § 3 provides, in pertinent part:

> The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law except for taxes levied for school operating purposes. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments. For taxes levied in 1995 and each year thereafter, the legislature shall provide that the taxable value of each parcel of property adjusted for additions and losses, shall not increase each year by more than the increase in the immediately preceding year in the general price level, as defined in section 33 of this article, or 5 percent, whichever is less until ownership of the parcel of property is transferred. *When ownership of the parcel of property is transferred as defined by law, the parcel shall be assessed at the applicable proportion of current true cash value.* [Emphasis added].

MCL 211.27a(1) contains the 50 percent limit for the assessed value of "property." MCL 211.27a(2) contains the limitations imposed under Proposal A for the taxable value of a "parcel of property." MCL 211.27a(2) provides:

> Except as otherwise provided in subsection (3), for taxes levied in 1995 and for each year after 1995, the taxable value of each *parcel* of property is the lesser of the following:

> (a) The property's taxable value in the immediately preceding year minus any losses, multiplied by the lesser of 1.05 or the inflation rate, plus all additions. For taxes levied in 1995, the property's taxable value in the immediately preceding year is the property's state equalized valuation in 1994.

> (b) The property's current state equalized valuation. [Emphasis added.]

MCL 211.27a(3) contains the "uncapping" exception for transferred property. *Mich Props*, 491 Mich at 531. It provides:

> Upon *a transfer of ownership of property* after 1994, the property's taxable value for the calendar year following the year of the transfer is the property's state equalized valuation for the calendar year following the transfer. [Emphasis added.]

MCL 211.27a(6) defines "transfer of ownership." It provides, in pertinent part:

> As used in this act, "transfer of ownership" means the conveyance of title to or a present interest in property, including the beneficial use of the property, the value of which is substantially equal to the value of the fee interest. Transfer of ownership of property includes, but is not limited to, the following:

> * * *

(j) A conveyance of an ownership interest in a cooperative housing corporation, except that portion of the property not subject to the ownership interest conveyed.

In *Colonial Square Coop v Ann Arbor*, 263 Mich App 208, 211-212; 687 NW2d 618 (2004), this Court held that it was permissible for the Legislature to include this definition of "transfer of ownership," but disapproved of an approach that failed to track the individual units transferred, stating:

> However, a finding that the definition does not run contrary to the Constitution does not end our inquiry. In this case, the city failed to track the individual units transferred, but rather uncapped the value of the whole parcel in proportion to the percentage of units transferred. This the city cannot do. Only by happenstance would the city arrive at an evaluation that did not affect "that portion of the property not subject to the ownership interest conveyed." MCL 211.27a(6)(j). Moreover, annual reevaluations of an entire parcel of property run contrary to the Constitution's plain meaning because they impose increasing obligations on the units in a cooperative that have not been transferred. Const 1963, art 9, § 3. The city's current estimation approach veils which units, if any, the city actually reassessed. The Constitution does not allow the city to reassess the entire parcel's value on the basis of a phantom reevaluation of the percentage of units transferred. Because of these shortfalls in the city's procedure, its application of the valid statute violated our Constitution.

In this case the hearing officer determined that the holding in *Colonial Square* could be satisfied in this case because individual units transferred were tracked by the City. The Tax Tribunal agreed. It rejected Forest Hills' argument that it would be necessary to assign separate parcel numbers to each unit in order to satisfy Const 1963, art 9, § 3, and MCL 211.27a.

On appeal, Forest Hills has failed to establish any error in the Tax Tribunal's application of MCL 211.27a(6)(j).

The flaw in Forest Hills' argument is that it is the only owner of the parcels of real property at issue in this case. MCL 211.27a(6)(j) does not address transfers of ownership of parcels of real property, but only transfers of an ownership interest in the cooperative housing corporation itself. Likewise, MCL 211.27a(3) addresses "a transfer of ownership of property" rather than a transfer of a "parcel of property."

This is significant because the word "parcel" is not used synonymously with "property" in the GPTA, but is used to identify the unit of taxation. As indicated in *Edward Rose Bldg Co v Independence Twp*, 436 Mich 620, 632; 462 NW2d 325 (1990), different parcels of property having the same owner are generally taxed as separate units. The GPTA contains two statutory exceptions. *Id*. at 632 n 4; see also *Great Lakes*, 227 Mich App at 411-412. Both exceptions are in provisions addressing an assessor's preparation of the assessment roll. MCL 211.24(a) provides, in pertinent part:

> All contiguous subdivisions of any section that are owned by 1 person, firm, corporation, or other legal entity and all unimproved lots in any block that are contiguous and owned by 1 person, firm, corporation, or other legal entity shall be assessed as 1 parcel, unless demand in writing is made by the owner or occupant to have each subdivision of the section or each lot assessed separately. However, failure to assess contiguous parcels as entireties does not invalidate the assessment as made.

MCL 211.25(1)(e) provides:

> When 2 or more parcels of land adjoin and belong to the same owner or owners, they may be assessed by 1 valuation if permission is obtained from the owner or owners. The assessing authority shall send a notice of intent to assess the parcels by 1 valuation to the owner or owners. Permission shall be considered obtained if there is no negative response within 30 days following the notice of intent.

Because MCL 211.27a(3) and (6)(j) only require that taxable value be uncapped in a proportion to the property associated with a particular transfer of interest in the cooperative housing corporation, the failure to have assigned a separate parcel number to the transferred unit does not preclude the taxable value of the property within the co-op that was transferred from being uncapped. As stated in the hearing officer's proposed opinion and judgment: "The effect upon the tax liability of the <u>coop</u> is the same whether this increase is attributed to a unit that has been assigned a separate parcel number or if the unit does not have a separate parcel number. It increases the tax liability of the coop in either event." The tribunal's approach to uncapping taxable value did not constitute an error of law.[5]

### V. CROSS-MOTIONS FOR SUMMARY DISPOSITION

Forest Hills moved in the circuit court for summary disposition under MCR 2.116(C)(10) and sought a declaration that MCL 211.27(4) is unconstitutional, as least as applied to its and other similarly situated properties, unless a capitalization-of-actual-income or

---

[5] Forest Hills also argues in a separate issue that the Tax Tribunal erred by failing to establish the taxable value for each individual parcel. Because Forest Hills does not cite the factual basis for this argument, this Court need not address it. "Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court." MCR 7.212(C)(7). An appellant may not leave it to this Court to search for a factual basis to sustain or reject a position. *Great Lakes*, 227 Mich App at 424. Nonetheless, the tribunal adopted the hearing officer's proposed opinion and judgment with one exception. In response to an exception taken by the City, the tribunal amended a chart on page 4 of the hearing officer's proposed opinion and judgment to reflect correct "current values" for 2007 and 2008. That chart contained combined true cash, assessed, and taxable values for the eight parcels that were at issue in the case. The tribunal's conclusions for each parcel and tax year were set forth on pages 7 to 9 of the hearing officer's proposed opinion and judgment. Because the tribunal did not modify these amounts, Forest Hills' argument is rejected as lacking factual support.

"share transfer values" approach is used to value its property because other approaches and, in particular, the procedures used by the City Assessor, will result in the property being over-assessed. No documentary evidence was submitted in support of the motion.

Defendants (the City and the City Assessor) responded by moving for summary disposition under MCR 2.116(C)(4) and (I)(2) on the ground that the circuit court lacked subject-matter jurisdiction to declare that the City Assessor's application of the tax statutes resulted in an unconstitutional assessment on Forest Hills' property. Defendants argued that the Tax Tribunal had exclusive jurisdiction to review the assessments and that the Tax Tribunal's review would cure any constitutional violation. Defendants asserted that the circuit court could accept the allegations in Forest Hills' complaint as true for purposes of the motion. Like Forest Hills, defendants did not submit a copy of the Tax Tribunal's decision in support of their motion. But Forest Hills' counsel argued at the September 28, 2011 hearing that the Tax Tribunal did not agree that nonprofit housing cooperatives must be valued on the basis of actual income, but would use whatever approach to value was deemed worthwhile. Further, it appears that the circuit court considered the Tax Tribunal's decision in its decision when ruling from the bench on September 28, 2011, as follows:

> Court hereby removes this case from abeyance based on the reasons stated in the Defendant's [sic] brief *and the final opinion and judgment issued by the Michigan Tax Tribunal.*
>
> [Forest Hills'] motion for summary disposition is denied and the Court grants judgment in favor of the Defendant [sic]. This is a final order. [Emphasis added.]

The circuit court specified in its order that it was denying Forest Hills' motion for summary disposition

and granting judgment in favor of defendants under MCR 2.116(I)(2) "for the reasons stated from the bench on September 28, 2011."

### A. PRESERVATION OF ISSUE

In general, an issue is not preserved for appeal unless it was presented to and decided by the circuit court. See *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). But an issue of subject-matter jurisdiction may be raised at any time, even for the first time on appeal. *Smith v Smith*, 218 Mich App 727, 729-730; 555 NW2d 271 (1996).

Defendants' challenge to the circuit court's subject-matter jurisdiction is properly before this Court because this issue may be raised at any time. Further, while the circuit court's decision could have been clearer, it appears that the circuit court agreed with defendants' argument that it lacked subject-matter jurisdiction. Regardless, the circuit court did not rule on Forest Hills' request for declaratory relief. Therefore, Forest Hills' request that this Court provide declaratory relief was not preserved for appeal. But if this Court concludes that the trial court had subject-matter jurisdiction, this Court may consider an issue involving a question of law for which the facts necessary have been presented. *Gen Motors*, 290 Mich App at 387. This Court will not reverse a trial court's order of summary disposition when the right result was reached for the wrong reason. *Taylor v Laban*, 241 Mich App 449, 458; 616 NW2d 229 (2000).

### B. STANDARD OF REVIEW

A trial court's grant or denial of a motion summary disposition in a declaratory judgment action is reviewed de novo. *Farm Bureau Ins Co v Abalos*, 277 Mich App

41, 43; 742 NW2d 624 (2007). Whether a trial court has subject-matter jurisdiction is also reviewed de novo. *Usitalo v Landon*, 299 Mich App 222, 228; 829 NW2d 359 (2013). This Court also reviews de novo issues involving the interpretation and application of a statute. *Toaz v Dep't of Treasury*, 280 Mich App 457, 459; 760 NW2d 325 (2008).

But a trial court has discretion in determining whether to grant declaratory relief under MCR 2.605. As explained in *Allstate Ins Co v Hayes*, 442 Mich 56, 74; 499 Mich 743 (1993), "Assuming the existence of a case or controversy within the subject matter of the court, the determination to make such a declaration is ordinarily a matter entrusted to the sound discretion of the court." "[A]n abuse of discretion occurs only when the trial court's decision is outside the range of reasonable and principled outcomes." *Saffian v Simmons*, 477 Mich 8, 12; 727 NW2d 132 (2007).

### C. ANALYSIS

Although the circuit court relied on MCR 2.116(I)(2) to grant defendants' motion for summary disposition, that rule merely provides that "[i]f it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party." Forest Hills' motion in this case was based on MCR 2.116(C)(10), which tests the factual support for a claim. Summary disposition under this rule is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Farm Bureau*, 277 Mich App at 43-44. The court is required to consider any affidavits, depositions, admissions, or other documentary evidence submitted by the parties when judgment is sought under MCR 2.116(C)(10). See MCR 2.116(G)(2).

Defendants' response to Forest Hills' motion was based on MCR 2.116(C)(4), which provides that summary disposition may be granted when "[t]he court lacks jurisdiction of the subject matter." Subject-matter jurisdiction refers to a court's power to act and authority to hear and determine a case. *Usitalo*, 299 Mich App at 228.

> In reviewing a motion under MCR 2.116(C)(4), it is proper to consider the pleadings and any affidavits or other documentary evidence submitted by the parties to determine if there is a genuine issue of material fact. *Cork v Applebee's of Michigan, Inc*, 239 Mich App 311, 315; 608 NW2d 62 (2000); see also MCR 2.116(G)(5). Jurisdictional questions are reviewed de novo, but this Court " 'must determine whether the affidavits, together with the pleadings, depositions, admissions, and documentary evidence, demonstrate . . . [a lack of] subject matter jurisdiction.' " *L & L Wine & Liquor Corp v Liquor Control Comm*, 274 Mich App 354, 356; 733 NW2d 107 (2007), quoting *CC Mid West, Inc v McDougall*, 470 Mich 878 (2004) (alteration by the *L & L* Court). [*Toaz*, 280 Mich App at 459.]

An appellate court will review a trial court's summary-disposition ruling under the correct rule. *Farm Bureau*, 277 Mich App at 43. Therefore, MCR 2.116(C)(4) provides the proper standard for considering defendants' challenge to the circuit court's subject-matter jurisdiction.

The circuit court lacked jurisdiction to consider Forest Hills' request for declaratory relief. Although MCR 2.605(A)(1) permits a court to grant declaratory relief in a case of actual controversy, it does not limit or expand the court's subject-matter jurisdiction. *UAW v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012).

At the time Forest Hills filed its complaint in circuit court in October 2009, MCL 205.731, as amended by

2008 PA 125, effective May 9, 2008, provided, in pertinent part:[6]

> The tribunal has exclusive and original jurisdiction over all of the following:
>
> (a) A proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under the property tax laws of this state.
>
> (b) A proceeding for a refund or redetermination of a tax levied under the property tax laws of this state.

Merely couching a challenge to an assessment in constitutional terms does not deprive the Tax Tribunal of its exclusive jurisdiction to consider a claim that the assessment is arbitrary or without foundation. As further explained in *Foreclosure Petition*, 286 Mich App at 112-113:

> The Tax Tribunal has no jurisdiction to hold statutes invalid or to consider constitutional matters; only the circuit court may do so. Thus, if a challenge to a tax assessment rests solely on an argument that the tax assessment was made under authority of an illegal statute, the circuit court would have jurisdiction over the matter. But merely phrasing a claim in constitutional terms will not divest the Tax Tribunal of its exclusive jurisdiction. . . .

---

[6] Before the amendment, the statute contained the same substantive provisions. It stated:

The tribunal's exclusive and original jurisdiction shall be:

(a) A proceeding for direct review of a final decision, finding, ruling, determination, or order of an agency relating to assessment, valuation, rates, special assessments, allocation, or equalization, under property tax laws.

(b) A proceeding for refund or redetermination of a tax under the property tax laws. [MCL 205.731, as enacted by PA 186.]

Where a forfeiture challenge does not require any findings of fact, but rather only construction of law— where no factual issues requiring the tribunal's expertise are present—the circuit court has jurisdiction to consider the issue. [Citations omitted.]

Although Forest Hills did not directly challenge any particular assessment in the complaint, Forest Hills challenged the method used by the City Assessor to determine the assessments by allegation in its complaint that MCL 211.27 requires the use of actual income to determine value. Forest Hills also alleged:

16. Regardless of whether or not the City Assessor's interpretation of MCL 211.27 is correct, the manner of its application to the Forest Hills Property, and others similarly regulated, is arbitrary and capricious and results in Forest Hills being treated differently from other taxpayers based upon no legitimate distinction.

17. If MCL 211.27 permits the procedures employed by the City Assessor, for the purpose of valuing the Forest Hills Property, then the statute violates [Forest Hills'] rights of due process and equal protection in contravention of U.S. Const. Amendment 14 and MCL [sic] Const. Art. 1, §§ 2 and 17 . . . .

* * *

21. Absent a declaration from this Court, Defendants will continue to value the Forest Hills Property, for assessment purposes, in an arbitrary and capricious way and in a way that results in Forest Hills being treated differently from other taxpayers based upon no legitimate distinction.

In essence, Forest Hills' claim was an attempted appeal of its tax assessment. Because the gravamen of Forest Hills' claim was that the City Assessor used an arbitrary and capricious method of valuation and this issue falls squarely within the Tax Tribunal's exclusive jurisdiction under MCL 205.731(a), the circuit court

lacked jurisdiction to consider it. Forest Hills' characterization of its claim of unequal treatment as one involving being "over-assessed" is consistent with this conclusion. The Tax Tribunal has exclusive jurisdiction to decide this issue. The circuit court lacked subject-matter jurisdiction to hear and decide Forest Hills' request for declaratory relief.

In Docket No. 305194, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. In Docket No. 306479, we affirm.

O'CONNELL, J., concurred with FITZGERALD, J.

WHITBECK, P.J. (*concurring in part and dissenting in part*). I agree with the majority's conclusions regarding the Tax Tribunal's duty to make an independent determination of true cash value, the application of MCL 211.27, and the city of Ann Arbor's cross-motion for summary disposition. But regarding the Tax Tribunal's true-cash-value determination, I would conclude that the Tax Tribunal adequately addressed the issue of economic obsolescence. Accordingly, I dissent from the majority's analysis under Part II(C)(3).

The majority concludes that the Tax Tribunal inappropriately applied the cost approach to the subsidized property. The majority reasons that the Tax Tribunal found that the hearing officer found that there was no economic obsolescence when the hearing officer determined that the Tax Tribunal could not make an independent estimate of functional obsolescence. I disagree with this characterization of the Tax Tribunal's finding.

When valuing property using "the cost approach, valuing the real property as subsidized," the Tax Tribunal should calculate "economic or external obsoles-

cence . . . ."[1] But "[i]f there is a market for subsidized housing at the location where it is built and a sufficient number of individuals who can afford to pay the rent required, then there will be little economic obsolescence under this approach."[2]

As the majority notes, the Tax Tribunal adopted the hearing officer's proposed opinion and judgment and considered Forest Hills' argument that the hearing officer failed to make findings regarding an obsolescence adjustment. The hearing officer determined that "where the vacancy rate has varied between 0% and 5% for the years at issue, this suggests that the cost approach could be used with no economic obsolescence applied." The Tax Tribunal rejected Forest Hills' argument that the hearing officer had failed to make findings on an obsolescence adjustment. The Tax Tribunal ruled that, given the hearing officer's use of the cost approach and the uncertain vacancy rate from 2004 to 2009, "the [hearing officer] *was correct in finding that, under* Meadowlanes, *there is no economic obsolescence.*"[3]

Whether the Tax Tribunal properly or improperly interpreted the hearing officer's poorly phrased determination is irrelevant. We review the Tax Tribunal's decision, not the hearing officer's decision.[4] When read in conjunction with the *Meadowlanes* Court's statement that there is little economic obsolescence when there is a market for subsidized housing, the Tax

---

[1] *Meadowlanes Ltd Dividend Housing Ass'n v City of Holland*, 437 Mich 473, 503; 473 NW2d 636 (1991).

[2] *Id.*

[3] Emphasis added.

[4] See *President Inn Props, LLC v Grand Rapids*, 291 Mich App 625, 630, 635-637; 806 NW2d 342 (2011) (observing that this Court reviews decisions of the Tax Tribunal; the Tax Tribunal's determination is de novo).

Tribunal's statement that the hearing officer correctly found that there was no economic obsolescence was, in fact, a finding that there was no economic obsolescence.

We must accept the Tax Tribunal's factual findings if "competent, material, and substantial evidence on the whole record" supports them.[5] Because there was evidence that the vacancy rates were low, competent evidence supported the Tax Tribunal's finding that the parcels did not have economic obsolescence. Accordingly, I would conclude that remand on this point is unnecessary. In all other respects, I agree with the majority opinion.

I would affirm in part, reverse in part, and remand.

---

[5] Const 1963, art 6, § 28; see also *Mich Props, LLC v Meridian Twp*, 491 Mich 518, 527; 817 NW2d 548 (2012).